720 F.2d 1429
 115 L.R.R.M. (BNA) 2096, 14 Ed. Law Rep. 624
 YSLETA FEDERATION OF TEACHERS, Harry W. Stone, III and
Denise Knight, Plaintiffs-Appellees Cross-Appellants,
v.
YSLETA INDEPENDENT SCHOOL DISTRICT, Charles W. Benson,
Kathleen Paxson, James W. Russell, Sr., Edd Fifer, Phyllis
Armijo, Constance Hulbert, Algie Felder and Chilo Madrid,
Defendants-Appellants Cross-Appellees.
 No. 82-1653.
 United States Court of Appeals,
Fifth Circuit.
 Dec. 16, 1983.
 
 Mayfield, Broaddus & Perrenot, Victor F. Poulos, Francis C. Broaddus, Jr., El Paso, Tex., for defendants-appellants cross-appellees.
 H. Davidson Smith, III, El Paso, Tex., for plaintiffs-appellees cross-appellants.
 Appeals from the United States District Court for the Western District of Texas.
 Before GOLDBERG, GEE and TATE, Circuit Judges.
 GEE, Circuit Judge:
 
 
 1
 Regulations adopted by defendant Ysleta Independent School District grant the Superintendent of Schools complete discretion to review all material to be distributed by employee organizations through the internal mail system of the school district, with power to suspend all organizational rights to school time and facilities of employee organizations that fail to submit material for clearance. Acting pursuant to these rules, Superintendent Charles Benson suspended the organizational rights of plaintiff Ysleta Federation of Teachers on the grounds that the Federation had circulated mail without first clearing it with him and had used the school mails to contact teachers who were not members of the Federation in violation of a supplementary regulation which restricted such communication to once-a-year recruitment.
 
 
 2
 The Federation then challenged both the prior clearance requirement and the once-a-year rule as facially unconstitutional restrictions on its First Amendment rights. Following the approach of this Court in Hall v. Board of Commissioners of Mobile County, Alabama, 681 F.2d 965 (5th Cir.1982), and Shanley v. Northeast Independent School District, 462 F.2d 960 (5th Cir.1972), the trial court permanently enjoined the prior clearance rule as unconstitutionally vague in that it set no guidelines for, or restrictions on, the superintendent's exercise of his power. The court upheld the once-a-year rule, however, stating that the Federation had failed to show that the restriction was unreasonable.
 
 
 3
 On appeal, defendant contends that reversal is required by the Supreme Court's intervening decision in Perry Educational Association v. Perry Local Education Association, --- U.S. ----, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), in which the Court held that the internal school mails of Perry Township were not public fora and access to them might therefore be regulated by the state so long as the regulation of speech was reasonable in light of the purpose that the mail system served. We find the school mail system at issue here to be what the Court in Perry called a "limited public forum by designation." See Perry, --- U.S. at ---- and n. 7, 103 S.Ct. at 955 and n. 7, 74 L.Ed.2d at 805 and n. 7. The standard of First Amendment review in such fora mandated by Perry in no way differs from that developed in prior decisions of this Court and the Supreme Court and employed by the court below. Applying that standard, we affirm the district court's injunction of the prior clearance rule but vacate and remand for further fact-finding as to the once-a-year recruitment rule.
 
 Background
 
 4
 On September 9, 1980, the Board of Trustees of Ysleta Independent School District adopted "Policy GCQDA," a set of guidelines defining the rights of employee organizations registered with the Superintendent of the District to the use of school facilities, including the internal mail system.[1] The relevant portion of this policy, section GCQDA(3), states:
 
 
 5
 Inter and IntraSchool Mail may be used by the organizations when such use does not interfere with school use as determined by the Superintendent and/or principal, and provided all questionnaires and/or materials are submitted to the Superintendent prior to distribution to school personnel through the school mails.
 
 
 6
 On the same date the Superintendent of the Ysleta School District promulgated a regulation in support of Policy GCQDA. Regulation GCQDA-R states in relevant part:
 
 
 7
 Organizations may put recruitment literature in all employee mailboxes once at the beginning of each school year. Thereafter, organizations may only use the school mail to communicate with their respective membership.
 
 
 8
 In September 1980, having previously complied with the filing requirements necessary to obtain the organizational rights outlined in Policy GCQDA, the Federation formally applied for and was granted these rights. Two months later, Superintendent Charles Benson wrote to Harry Stone, President of the Federation. In his letter, Superintendent Benson stated that he had received a copy of the Federation's Bulletin (apparently for his review), that he felt it did not accord with his interpretation of school policy on a particular issue, and that under the terms of Policy GCQDA he was authorized to prevent distribution through the school mails of any material that he felt did not accord with school policy. The Superintendent took no further action with regard to the offending literature.
 
 
 9
 About a year later Stone wrote a letter to the President of the Board of Trustees requesting that the Board reconsider its recent reduction of the supplemental pay of special education teachers. Copies of this letter, together with Federation membership application forms, were sent, via the United States mail, to special education teachers at various campuses of the Ysleta Independent School District.[2] The Federation did not submit this correspondence to Superintendent Benson before posting it. At that time the Federation had already exhausted its once-a-year opportunity to distribute recruitment material in all employee mailboxes.
 
 
 10
 As a result, Superintendent Benson notified Stone by letter that the Federation's organizational rights under Policy GCQDA were temporarily suspended because the letter and attached membership information violated both the "prior review" rule of Policy GCQDA and the once-a-year rule of Regulation GCQDA-R. Following up, Benson sent a memo to all district principals stating that the Federation was not entitled to use the school mail system, bulletin boards, public address system, or school facilities. Deprivation of organizational rights under the Policy also meant that the Federation would not be eligible for employee payroll deduction of dues and that Federation officers could not obtain "release time" for its business purposes. Neither hearing nor opportunity to respond to the charges was afforded the Federation before the termination of the rights granted under the Policy. When Stone sought an audience with the Board to try to reverse the Superintendent's action, he was informed by Benson that the matter would be discussed at the Board meeting on October 27th--a date well past the deadline for teachers to elect to pay dues through payroll deduction. On September 22, the Federation filed suit in federal court challenging both the policy and the regulation.
 
 
 11
 At the October 27th hearing, the Board determined that although the Superintendent had acted correctly in determining that the Federation had violated the terms of Policy GCQDA(3) and Regulation GCQDA-R and depriving the Federation of organizational privileges, the period of suspension of privileges had been sufficient punishment. Accordingly, the Board restored the Federation's organizational rights.
 
 
 12
 In federal district court the Federation challenged both Policy GCQDA(3) and Regulation GCQDA-R as facially unconstitutional restraints on speech. Applying the analysis of Hall and Shanley, the trial court permanently enjoined Policy GCQDA(3) as unconstitutionally vague but upheld the once-a-year rule. On this appeal, the defendant school district challenges the trial court's injunction of the prior clearance rule, while plaintiff Federation challenges the court's affirmance of the once-a-year recruitment restriction.
 
 
 13
 The Status of the Ysleta School Mail System under Perry
 
 
 14
 "The First Amendment's guarantee of free speech applies to teachers' mailboxes as surely as it does elsewhere within the school ... and on the sidewalks outside." Perry, --- U.S. ----, ----, 103 S.Ct. 948, 954, 74 L.Ed.2d 794, 804 (citations omitted). However, the federal courts have always recognized that in the school context judicial respect for the free exercise of First Amendment rights by teachers and students must be tempered by a recognition that school administrators have broad latitude in formulating and administering regulations to promote the safety and order necessary to the educational process. See Hall, 681 F.2d at 967-68.
 
 
 15
 In analyzing the regulations at issue here, we are guided by the Supreme Court's recent and comprehensive discussion in Perry of the standard by which to evaluate limitations on the right of access to the internal mail system of a public school. Perry sets up an analytical scheme in which public property is divided into two types: that property which by tradition or designation is a "public forum" and that which is not. See, --- U.S. at ---- - ----, 103 S.Ct. at 954-55, 74 L.Ed.2d at 804-05. The internal mail system of a public school is not a public forum by tradition, the Court held. Id. --- U.S. at ----, 103 S.Ct. at 955, 74 L.Ed.2d at 805. It may, however, become a public forum "by designation" if the school opens the system for use by the public, or become a limited public forum by designation if the school opens it for use by certain groups or for the discussion of certain subjects. Id., note 7.
 
 Although a state is not required to
 
 16
 indefinitely retain the open character of [designated public forums], as long as it does so it is bound by the same standards as apply in a traditional public forum. Reasonable time, place and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest.
 
 
 17
 Perry, --- U.S. at ----, 103 S.Ct. at 955, 74 L.Ed.2d at 805, citing Widmar v. Vincent, 454 U.S. 263, 269-70, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981). If the school does not open the system for use in whole or in part, the school mails do not become a "public forum" at all. Accordingly, the school retains
 
 
 18
 the right to make distinctions in access on the basis of subject matter and speaker identity. These distinctions may be impermissible in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property. The touchstone for evaluating these distinctions is whether they are reasonable in light of the purpose which the forum at issue serves.
 
 
 19
 Perry, --- U.S. at ----, 103 S.Ct. at 957, 74 L.Ed.2d at 807.
 
 
 20
 In Perry the Court found that the particular school mail system in question had not been designated a public forum--even on a limited scale--since there was no specific policy or practice that the mail system be open to the general public or to employee organizations. See id. --- U.S. at ---- - ----, 103 S.Ct. at 956-57, 74 L.Ed.2d at 806-07. Here, by contrast, Policy GCQDA itself specifically states that the right to use the school mails is, like the other organizational rights granted by the policy, available to all employee organizations once they complete certain procedural filing requirements. Following the analysis in Perry, we conclude that although the school was not obligated to grant employee organizations the right to use the school mails at all, once it opened the mail system to all employee organizations without distinction it became bound by the same constitutional standards that apply to a traditional public forum. Perry, --- U.S. at ----, 103 S.Ct. at 957, 74 L.Ed.2d at 807. Thus, far from mandating reversal, Perry clearly states that the standard previously applied by this Court in Hall and Shanley to regulations on the distribution of materials within a school also applies to the particular school mail system under review here.[3]
 
 Policy GCQDA
 
 21
 As is noted above, a court measuring the constitutional protections of the First and Fourteenth Amendments must assess the reasonableness of the restriction in view of the special characteristics of the school environment. Tinker v. DesMoines, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969); see also Ferrell v. Dallas Independent School District, 392 F.2d 697, 704-05 (5th Cir.) (Godbold, J. concurring), cert. denied, 393 U.S. 856, 89 S.Ct. 98, 21 L.Ed.2d 125 (1968). Unquestionably, however, any such restrictions in a public forum--whether designated or traditional--must be "bounded by clear and precise standards" capable of objective determination. Southeastern Promotions Ltd. v. Conrad, 420 U.S. 546, 553, 95 S.Ct. 1239, 1244, 43 L.Ed.2d 448 (1975); Shanley v. Northeast Independent School District, 462 F.2d 960, 976-77 (5th Cir.1972).[4]
 
 
 22
 Policy GCQDA fails this constitutional test. As the court below concluded, the prior clearance rule lacks the guidelines, criteria or standards that would render the rule constitutionally acceptable by limiting the discretion of the Superintendent. See Hall, 681 F.2d at 968-69; Shanley, 462 F.2d at 977.
 
 
 23
 Defendants argue that the prior clearance rule should be read to incorporate the dual goal which Superintendent Benson attributed to it in his letter of November 1980. In that letter the Superintendent states that the purpose of the procedure is "to insure that: (1) materials circulated through the pony are done so in accordance with school board policy, and (2) that the pony is not overburdened by volume." We note initially that these justifications seem inapplicable to the instant case since the distribution does not appear to have involved the pony. Each of these justifications presents additional serious problems, however. As to the first, the Superintendent's letter makes clear that he interprets the rule to grant him power to deny circulation to all mail not "in accordance with school policy" in the sense that it expresses a point of view at odds with that of school officials. Such blatant suppression by the state of dissenting views cannot pass constitutional muster. Indeed, Perry specifically states that regulations which "suppress expression merely because public officials oppose the speaker's view" are prohibited even where the public property regulated is not a public forum at all. Perry, --- U.S. at ----, 103 S.Ct. at 955, 74 L.Ed.2d at 805.
 
 
 24
 While the sheer volume of mail distributed through the pony is certainly a legitimate concern of the school, Policy GCQDA(3) does not "fit" this objective since it does not direct the Superintendent to assess the bulk or weight of the material, let alone provide any criteria by which he should do so.[5]
 
 
 25
 The arbitrary and discriminatory restriction of First Amendment rights which renders Policy GCQDA(3) unconstitutional is compounded by the fact that no appellate mechanism is provided for as-of-right review of an adverse decision by the Superintendent before the suspension of organizational rights. Hall v. Board of School Commissioners of Mobile County, Alabama, 681 F.2d at 973 (failure to provide review mechanism constitutes deprivation of due process); Shanley v. Northeast Independent School District, 462 F.2d at 977-98 (same). As we recognized in Shanley, the absence of an efficient review procedure can be particularly harmful where it may result in deprivation of the right of communication during a crucial period of time:
 
 
 26
 The occasions calling for the exercise of various forms of protected speech are fleeting, and lack of clarity or a delay in implementation of screening regulations carry the inherent danger that the exercise of speech might be chilled altogether during the period of its importance.
 
 
 27
 Id. at 977. This case provides a forceful illustration. Here, the Federation was deprived of the right to use the school mails during the period when teachers had to decide whether to permit deduction of Federation dues from their paychecks and Federation officers were denied the right to use "release time" for business purposes at a point in the school year when organizational needs were particularly pressing.
 
 
 28
 We find our concluding comments in Hall again apt here:
 
 
 29
 [T]he decision of the district court is a narrow one.... It involves the rights of teachers to communicate with each other and to be communicated with. It does not involve the rights of students or of persons not assigned to the schools except as related to the rights of the teachers. It does not involve classrooms, students in assembly, or student activities.
 
 
 30
 * * *
 
 
 31
 * * *
 
 
 32
 It should be particularly noted that the policies have not been ruled invalid because they require prior submission and prior approval. Rather, this decision turns on the fact that as written they do not furnish sufficient guidance to prohibit the unbridled discretion that is proscribed by the Constitution. There is little doubt that under the guidance of the cases that have developed this law, the Board will be able to devise and implement policies permitting discretion needed to efficaciously operate the ... schools, while providing the clarity and procedures required by the First Amendment.
 
 
 33
 Hall, 681 F.2d at 968-69.
 
 Regulation GCQDA-R
 
 34
 Regulation GCQDA-R limits employee organizations' rights to distribute recruitment literature through the school mail to a single distribution at the beginning of the school year. Violation of this once-a-year rule constitutes grounds for suspension of all organizational access rights granted by Policy GCQDA(3).[6] In considering the facial constitutionality of this regulation, the district court summarily concluded that: "Plaintiffs have failed to show that Regulation GCQDA-R is unconstitutional.... The record does not show, or even suggest, that the restriction on the organization's recruiting is unreasonable...." On appeal plaintiffs argue that the district court applied an erroneous burden of proof: that the proper inquiry is not whether the plaintiffs have demonstrated that this content-based restriction on their speech in a limited public forum is unreasonable, but rather whether the state has demonstrated that the Regulation is narrowly drawn and furthers a compelling state interest.
 
 
 35
 We agree with the plaintiffs. Perry states clearly that in a limited public forum by designation--such a forum as the school mails of Ysleta Independent School District are made by Policy GCQDA--"a content-based prohibition must be narrowly drawn to effectuate a compelling state interest." Perry, --- U.S. at ----, 103 S.Ct. at 955, 74 L.Ed.2d at 805. We note that the few courts that have so far had occasion to apply Perry to content-based restrictions in limited public fora created by school systems have found Perry's mandate clear in this regard and have followed it. See Bender v. Williamsport Area School District, 563 F.Supp. 697, 705 (M.D.Pa.1983); Country Hills Christian Church v. United School District 512, 560 F.Supp. 1207, 1220 (D.Kan.1983).
 
 
 36
 We do not intimate that the school could not articulate a justification for this once-a-year rule which would pass constitutional muster. Nowhere in this record, however, do we find articulated such a justification which "fits" this regulation; and it is not the place of appellate courts to speculate where the record is deficient. We therefore vacate the district court's judgment as regards Regulation GCQDA-R and remand the cause for further proceedings on that issue in accordance with this opinion. Since this remand may necessitate reconsideration by the district court of the issues of whether the Federation is entitled to damages and the appropriate amount of attorney's fees, we vacate its judgment as to these as well.
 
 The judgment of the district court is
 
 37
 AFFIRMED IN PART and, IN PART, VACATED. The cause is REMANDED.
 
 
 
 [1]
 Mail addressed to teachers in the Ysleta school district passes through two interlocking systems: the U.S. mails and the "pony", an inter- or intra-district distribution system. United States mail addressed to individual teachers at the school is received by a clerk and then sorted and placed in mailboxes of individual staff members or, on some campuses, in a departmental box from which staff retrieve their personal mail. In addition, the school district contracts with a private company to provide mail service between campuses and between any campus and the main office. Policy GCQDA and Regulation GCQDA-R govern the use of this latter system, the "pony," and not the sending of mail through the United States mail to teachers at a particular school
 
 
 [2]
 The letters were addressed simply to "Special Education teachers," not to any individual, and were distributed to the Special Education teachers on each campus to which they were sent. The parties have stipulated that this distribution constituted use of the internal mail system. Counsel for the Federation, however, argues that at the time of sending the letters the Federation (which at that time had no attorney) did not believe this mailing constituted use of the "pony."
 
 
 [3]
 We note also that the fact that Policy GCQDA(3) grants the Superintendent authority to suspend access to all means of in-school communication--access to bulletin boards, public address systems and school facilities as well as to the school mails--when he determines that an employee organization has violated mail restrictions further distinguishes the facts of this case both from those of Perry and from the line of non-public forum cases in which restrictions on access have been upheld at least in part because other means of access were available. Indeed, in Perry the Court specifically noted that alternate means of communication remained available to a union shut out of that school mail system, see Perry, --- U.S. at ----, 103 S.Ct. at 959, 74 L.Ed.2d at 810
 We agree with the district court in Olsen v. Communications Workers of America, 559 F.Supp. 754, 767-8 (D.N.J.1983), which concluded on facts similar to the instant case that:
 The reasoning of Perry, however, clearly does not validate the State's actions in the present case which prohibit those opposed to the union's representation fee system from expressing their views anywhere on State property. In fact, the language in Perry suggests that the Court would consider such a prohibition unlawful.
 * * *
 In the present case, unlike Perry, plaintiffs were not only excluded from communicating with fellow employees via the bulletin boards, they were excluded from communicating with fellow employees anywhere on State property, regardless of whether the areas constituted public or non-public fora. The reason they were so excluded was because they espoused views which were hostile to those of CWA and its members. This is a clear violation of the First Amendment.
 
 
 [4]
 We note that both Southeastern Promotions and Shanley involved the type of designated, rather than traditional, public forum that is present in this case, thus confirming the logically inevitable conclusion that the requirements of clarity and objectivity apply equally to restrictions operating in both types of public arenas
 
 
 [5]
 By casting the interpretation advanced in the Superintendent's letter as the "guidelines" of Policy GCQDA(3), defendants have estopped themselves from arguing that the Board intended to incorporate constitutional guidelines and standards developed by the courts into Policy GCQDA. We have therefore no need to consider those cases sustaining imprecise regulations in schools on the grounds that the regulations incorporated case law. See Hall, 681 F.2d at 968 (rejecting this incorporation argument where defenses asserted demonstrated that defendants did not interpret the policies challenged within the constraints of case law); cf. Murray v. West Baton Rouge Parish School Board, 472 F.2d 438 (5th Cir.1973) (sustaining imprecise school disciplinary code where evidence showed that school officials interpreted code to incorporate standards established by case law)
 
 
 [6]
 The Superintendent cited violation of Regulation GCQDA-R as another ground for his suspension of the Federation's privileges, and the district court denied the Federation damages on the ground that this alternate basis for suspension of access rights was valid