**GAY STUDENT SERVICES, J.M. Minton, Keith Stewart and Patricia Wooldridge, Plaintiffs-Appellants,**

v.

**TEXAS A & M UNIVERSITY, et al., Defendants-Appellees.**

No. 82–2366.

United States Court of Appeals, Fifth Circuit.

Aug. 3, 1984.

---

Larry Sauer, J. Patrick Wiseman, Nelson & Mallett, Houston, Tex., for plaintiffs-appellants.

Nan Hunter, Steven A. Rosen, New York City, for amicus—Lambda Legal Defense & Educ. Fund.

M. Robert Schwab, Ross, Banks, May, Cron & Cavin, Thomas J. Coleman, Jr., Houston, Tex., for amicus—Texas Human Rights.

Mark White, Atty. Gen. of Tex., Ann Kraatz, Asst. Atty. Gen., Austin, Tex., for defendants-appellees.

Wm. Charles Bundren, Dallas, Tex., for amicus—Dallas Doctors.

Nadine Taub, Rutgers University Law School, Newark, N.J., for amicus—American Public Health Assn.

Before BROWN, REAVLEY and WILLIAMS, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

Today we address the issue whether a state supported university violates the First Amendment rights of this gay student organization and three of its members by refusing to afford it official recognition.

**1.** TAMU is a state supported University, part of the Texas A & M University System, organized pursuant to Tex.Educ.Code §§ 85.01 *et seq.* (Vernon Ann.).

**2.** GSS grew out of another gay group originally founded in 1975, called "Alternative." Dr. Sherri Skinner, a founding member of GSS, testified that Alternative was a community group rather than a student group. GSS was founded as a TAMU student group in 1976 by Skinner and Patricia Wooldridge, Michael Minton, Charles George, Kathryn Kraatz, and Michael Garrett.

**3.** The advantages of official recognition include the following:

The District Court found that the University's refusal to recognize the group was not based on the content of the group's ideas about homosexuality. Instead, the trial court found that the group had been denied recognition due to the University's long standing policy of refusing to recognize fraternal organizations whose principal purpose is to hold social gatherings to encourage friendship and personal affinity. Finally, the Court held that the University had not created a forum open to fraternal or social groups. Thus, on appeal, the University contends that it never created a generally open forum for First Amendment expression. For these reasons, the District Court concluded and the University argues that there was no constitutional deprivation. We think those findings and conclusions are clearly erroneous and reverse. We affirm, however, the Court's conclusion that recovery of monetary damages is prohibited by the Eleventh Amendment.

*Facts and Procedural History*

In April of 1976, a group of students on the Texas A & M University (TAMU) [1] campus met with Dr. John Koldus, the University's Vice President for Student Affairs, to discuss with him the possibility of using University facilities to conduct the business of a group they had formed, Gay Student Services (GSS).[2] The students informed Koldus that they did not at that time seek official recognition, but merely wished to post notices on school bulletin boards, meet on campus, and have access to the student newspaper and radio.[3] Their reasons for

1. Use of campus facilities;
2. Advertising on campus;
3. Availability of student activities' funds;
4. Use of office area within the Student Programs Office;
5. Assistance in preparing an organization budget;
6. Secretarial services;
7. Authorization to hold meetings and functions on campus;
8. Primarily free use of university meeting rooms and facilities;
9. Free use of banking facilities at Student Finance Center;
10. Use of an organization mailbox in the Student Finance Center;

not seeking official recognition included their wish to maintain the anonymity of some of their members as well as their understanding that the group's existence might pose an "uncomfortable" problem in the conservative TAMU community.

Koldus advised the students that no form of limited recognition was available and referred them to Dr. Carolyn Adair, Director of Student Affairs, to receive information regarding the requirements for official recognition. Dr. Adair advised the students to apply for recognition as a service group rather than a political or social group because there would be fewer problems. Accordingly, the goals and purposes reflected on GSS's application were service-related. The application, dated April 5, 1976, stated the following goals and purposes:

1) To provide a referral service for students desiring professional counseling including psychological, religious, medical, and legal fields.

2) To provide to the TAMU community information concerning the structures and realities of gay life.

3) To provide speakers to classes and organizations who wish to know more about gay lifestyles.

4) To provide a forum for the interchange of ideas and constructive solutions to gay people's problems.

11. Access to free publicity for the organization in publications such as the "All-University Calendar," the "Student Organization Guide," and others;
12. Use of campus bulletin boards to publicize activities;
13. Use of kiosks;
14. Use of locator service maintained at student activities office;
15. Facilities scheduling;
16. Use of University vehicles;
17. Office, work and storage space; and
18. Use of graphic arts operations for posters, duplicating and other printing services.

**4.** The body of Koldus' letter, addressed to Michael Garrett of Alternative, reads as follows:

The request to recognize the student organization called 'Gay Students Services' was forwarded to my office for action. I have read and studied the request and, on the basis of

Dr. Koldus directed Dr. Adair to forward GSS's application directly to him rather than to the Student Organization Board, which is ordinarily the first step in attaining recognition. Koldus, who is responsible for the final decision regarding recognition, stated that this was his usual procedure when dealing with applications presenting special problems. Sherri Skinner, one of the group's founding members, testified that Koldus had informed the students at the initial meeting that the University would deny their application.

On May 4, 1976, the student representatives of GSS again met with Koldus, who told them that he had written a response to their application. Koldus stated that University officials had asked him to delay release of the response until Jack Williams, President of the University, and the University legal staff had had an opportunity to study the request. A memorandum dated May 28, 1976 from Williams to Koldus indicated that Koldus had provided information regarding other Texas universities' treatment of similar situations. Furthermore, Williams' memo stated that TAMU would not recognize GSS "until and unless we are ordered by higher authority to do so." The students met with Koldus in June and September of 1976, again requesting action on their application. Finally, Dr. Koldus issued a letter denying recognition on November 29, 1976.[4]

the information presented, am denying the group official university recognition.

Contained within the *Texas A & M University Regulations 1975–76* is the following statement: 'Student organizations may be officially recognized when formed for purposes which are consistent with the philosophy and goals that have been developed for the creation and existence of Texas A & M University.' Homosexual conduct is illegal in Texas and, therefore, it would be most inappropriate for a state institution officially to support a student organization which is likely to incite, promote and result in acts contrary to and in violation of the Penal Code of the State of Texas.

Furthermore, the university administrative staff and faculty are responsible for providing referral services, educational information, appropriate speakers for classes and a forum for the interchange of ideas. Student organiza-

Dr. Koldus' denial was premised on two points. First, Koldus asserted that because homosexual conduct was illegal in Texas at that time,[5] it would be inappropriate for TAMU officially to support an organization likely to "incite, promote and result" in homosexual activity. Second, Koldus stated that the TAMU staff and faculty, not TAMU student organizations, were responsible for providing referral services, educational information, and speakers to students and the larger public. Thus, Koldus concluded that the stated purposes and goals of TAMU were not "consistent with the philosophy and goals" of TAMU. Nowhere in the letter did Koldus assert that denial of recognition was premised on the fraternal nature of GSS.

This lawsuit, seeking declaratory, injunctive and compensatory relief under 42 U.S.C. § 1983, was filed in February of 1977. In November of 1977, the District Court granted TAMU's motion to dismiss without stating its reasons for doing so, and GSS appealed. We vacated and remanded, finding that none of the asserted bases for dismissal were proper. *Gay Student Services v. Texas A & M University,* 612 F.2d 160 (5th Cir.), *cert. denied,* 449 U.S. 1034, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980). The District Court held a bench trial in November of 1981. The evidence presented at trial consisted almost solely of medical testimony from specialists in human sexuality regarding the effect the presence of a homosexual student group

might have on a university campus. The defense in particular centered on statistics and opinions documenting increased crime rates and severe emotional problems found within the homosexual community. The defense presented no testimony at trial regarding whether GSS functioned as a purely social organization.

On May 19, 1982, the District Court entered a final judgment for TAMU, along with findings of fact and conclusions of law. On appeal, GSS asserts that these findings and conclusions were erroneous and require reversal. We agree, for the reasons that follow.

### The Nature of GSS

In its findings of fact, the District Court found that TAMU "did not and has not to the time of trial in this case, recognized fraternal organizations, i.e. student groups whose principal if not sole purpose is to hold social gatherings to encourage friendships and personal affinity." The record shows that in October 1977, Dr. Koldus denied recognition to Sigma Phi Epsilon, a national social fraternity, by stating the following policy:

For over one hundred years, Texas A & M has chosen not to include the national social fraternity and sorority system as an official part of its educational program. The University has supported the premise that its social character was developed in the concept of togetherness in that all students were Aggies and that a

---

tions do not have the educational experience, the responsibility nor the authority to educate the larger public. The responsibility for the education of the students at Texas A & M University resides by law with the university administrative staff and faculty.

It is my contention, therefore, that the stated purposes and goals of the 'Gay Student Services' are not 'consistent with the philosophy and goals that have been developed for the creation and existence of Texas A & M University.'

5. Tex. Penal Code § 21.06 (Vernon Ann.), still on the books, provides as follows:

*Homosexual Conduct*

(a) A person commits an offense if he engages in deviate sexual intercourse with another individual of the same sex.

(b) An offense under this section is a Class C misdemeanor.

*Id.*

In *Baker v. Wade,* 553 F.Supp. 1121 (N.D.Tex. 1982) the District Court held that the statute was not rationally related to any legitimate state interest and therefore violated the gay plaintiff's right to equal protection under the laws. Furthermore, the Court held that the right of privacy extends to private sexual conduct between consenting adults, whether heterosexual or homosexual. The District Court thus found the statute unconstitutional. The State of Texas appealed, and a decision is now pending in the Fifth Circuit. 743 F.2d 236 (5th Cir.1984).

social caste system would detract from this most important concept which welded together the students that attended Texas A & M.

\* \* \* \* \* \*

As an administrator, it is my responsibility to attempt to perpetuate these traditions which have added not only to the character of the institution but to its strength. It is upon this premise that I deny official university recognition of Sigma Phi Epsilon.

At the heart of the findings and conclusions of the District Court was its decision that GSS was merely a "fraternal or social" group "whose message is mere friendship and personal affinity." This led the Court to conclude that GSS was not denied recognition "based upon the content of [its] ideas about homosexuality, since the group is not trying to convey any message about homosexuality," but rather because GSS was a "fraternal" organization subject to TAMU's traditional ban. We think this factual finding was clearly erroneous, for several reasons.

Such a finding is utterly at odds with the asserted purposes of GSS, which sought recognition to provide services and information regarding gay issues to gay persons and to the general public. *See* Statement of Goals and Purposes, *supra*. Moreover, Dr. Koldus' asserted reasons for de-

nying recognition were clearly based on his perception that the organization *would* attempt to convey ideas about homosexuality. Nowhere in his letter of November 29 does Koldus state that the University's refusal to recognize GSS was based on anything other than reasons tied to the homosexual nature of the group.[6] *See* text of letter at footnote 4, *supra*. Further evidence of TAMU's opposition to recognizing a gay student group is found in a resolution passed by the TAMU Board of Regents following the filing of this lawsuit in 1977. The minutes of the Board's meeting of March 22, 1977 state that the following "policy position" was approved:

So-called "gay" activities run diabolically [*sic* —diametrically?] counter to the traditions and standards of Texas A & M University, and the Board of Regents is determined to defend the suit filed against it by three students seeking "gay" recognition and, if necessary, to proceed in every legal way to prohibit any group with such goals from organizing or operating on this or any other campus for which this Board is responsible.

Moreover, TAMU presented no evidence at trial regarding the "fraternal" nature of GSS. Such a theory for denying recognition was never advanced in the case until TAMU filed its post-trial brief.[7] Indeed,

---

6. We point out that when Koldus denied recognition to Sigma Phi Epsilon, he made it clear that the fraternal nature of the organization was the reason for the denial.

7. That this theory was an afterthought is supported by the fact that the parties appear to have agreed at the start of the trial that GSS had stated a prima facie First Amendment case merely by introducing in evidence the application for recognition and Koldus' letter of denial.

Defense Counsel: I think, your Honor, as a matter of fact, I think he might have accomplished his burden.... It is up to us then to show that there was a good reason not to grant the permit. And we propose to do that for two reasons. One, our expert testimony will show that this recognition will lead to increased homosexual conduct which is presently against the laws of Texas. And, too, the venereal disease rate as well as other health problems of the homosexu-

als is much greater than the normal population.

The Court: ... so truly it seems to me the only issue to be tried is whether or not there is a compelling state interest that would override the First Amendment right that you all allege to have been denied and which are admittedly denied.

Defense Counsel: I think we have got the big burden in this case.

The parties then agreed that counsel for GSS would begin with a "bare bones" or "brief presentation" of the prima facie case and then put on expert testimony, anticipating the need to rebut the defense's evidence of compelling state interest. As late as the third day of trial, the trial judge stated, "I think we all agreed that there was at least a prima facie case and that [counsel for GSS] had the problem of putting on as an initial proposition his witnesses to refute and rebut what [the defense witnesses] are going to do." Thus, because the case was tried

the sole evidence alleged to support the theory was advanced by GSS itself, in its attempt to show that GSS was a "normal" student group rather than a hotbed of deviant homosexuals anxious to influence the morals of impressionable TAMU students at on-campus meetings. TAMU relies, for example, on the testimony of Dr. Kenneth Nyberg, who agreed to become GSS' faculty advisor and attended some of its early meetings. Dr. Nyberg stated:

Theirs was a quintessent typical student group.... What you are talking about are students so their interests are those of students.... How do you, you know, how do you get registered? What person to take for a class, what person not to take for a class. What did you do last week? It was mostly concerning ... student issues.

\* \* \* \* \* \*

They reflected most of the same goals and aspirations and concerns almost all my students did. They subsequently looked into most of the same issues. The singular exception was, of course, the homosexual aspect.

It later became clear that GSS elicited such testimony from Dr. Nyberg in order to contravene a later opinion by defense witness Dr. Cameron,[8] who opined that in light of statistical evidence regarding homosexual behavior, "it would be a shock really, if there were not homosexual acts engaged in at or immediately after" a meeting of a homosexual student organization.

Apparently relying upon the testimony of Dr. Sherri Skinner, the District Court also found that GSS was a fraternal group that was "not trying to convey any message about homosexuality"[9] because it was "not organized for political advocacy" and had "no official position regarding repeal of Tex.Penal Code Ann., § 21.06, which makes homosexual conduct a misdemeanor." Dr. Skinner's testimony, like that of Dr. Nyberg, was elicited by GSS for the express purpose of showing that GSS was a typical student service group deserving recognition rather than a substitute for a gay singles bar. Moreover, Dr. Skinner emphasized that any political or social goals GSS may have had were intentionally eliminated from the application for recognition because Dr. Adair had advised the students to seek recognition as a service-type group. What Dr. Skinner actually said, in the context of emphasizing the service-related purposes of GSS, was that while the individual members of GSS would probably support repeal of the anti-homosexuality laws, "the organization itself has been very careful to keep clear of political action or activism, per se." In light of the fact that TAMU recognizes more service-related student organizations than it does political ones,[10] we

with the parties apparently agreeing that a prima facie case was stated, we cannot fault GSS for failing to present further evidence of the service-related nature of the group.

8. The District Court recognized that the case was being tried backwards, requiring GSS to present testimony in anticipation of TAMU's defense. *See* n. 7, *supra.*

9. Could we see no reason in the record to overturn this finding of fact, logic would compel us to find it clearly erroneous. At a very minimum, GSS's quest for recognition, coupled with its desire to publicize its meetings and activities—indeed the very filing of this lawsuit—is clearly a "message" that its members reject society's traditional expectations that they associate furtively and in fear that their homosexuality will be detected. Dr. Skinner's testimony that the group desired to convince the greater public that they are "different" only with respect to their choice of a romantic partner bears this out. *See* note 10, *supra.*

10. The *1981 TAMU Student Organizations Guide* lists 21 service organizations, including three national service fraternities or sororities, while listing only six political groups. TAMU has also recognized a Women's Awareness Group, which is described as "a group of women *and* men who discuss women's role in society and especially how women's rights relate to life" at TAMU. The MSC Black Awareness Group "promotes a better understanding of the heritage and culture of Black Americans through cultural and social programs." When asked how she would describe GSS's "message," Dr. Skinner replied that GSS "seeks to inform the students who would not otherwise have any idea of what goes on of the fact that gay people live and function primarily the same as anyone else with the exception that their choice of romantic partner is one of the same gender." In our view, this description is highly similar to that put forth by the officially-recognized Women's and Black students' groups.

simply cannot agree that GSS's failure to organize as a political group renders it a social or fraternal group subject to the TAMU ban.

Finally, we point out that recognition was denied before GSS ever had the opportunity to function as the service-type group it sought to become. The Court's determination regarding the nature of the group was based on how it functioned as an off campus group that had been denied the benefits and privileges of official recognition. The minutes of GSS's meetings reveal that much of the group's meeting time was consumed by discussion of the pending lawsuit. We think evidence concerning how GSS functioned as an off campus group is irrelevant to the determination whether GSS, as it sought to exist, was entitled to official recognition.

For all the foregoing reasons, we conclude that the District Court's factual findings with regard to the nature of GSS were clearly erroneous. We think it clear from the facts that TAMU refused officially to recognize GSS based upon the homosexual content of the group's ideas—which it sought to convey through implementing its stated goals and purposes.

### Background: The First Amendment

At least three times in the recent past, this Court has seen fit to make "major expansions in the First Amendment rights of students." *University of Southern Mississippi Chapter of the Mississippi Civil Liberties Union v. University of Southern Mississippi*, 452 F.2d 564, 565 (5th Cir.1971). In *Dixon v. Alabama State Board of Education*, 294 F.2d 150 (5th Cir.) *cert. denied*, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961), we held that the due process rights of six black students were violated by their expulsion without a hearing from a state supported university following their participation in a Montgomery lunch counter sit-in. That decision has

since been interpreted to mean that no longer is "attendance at a state university ... a privilege granted by the state ... subject to whatever conditions the state [seeks] to impose." *University of Southern Mississippi, supra*, 452 F.2d at 565.

Next, in *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir.1966), we paved the way for the Supreme Court's landmark decision in *Tinker v. Des Moines Independent School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), when we held that students' rights to freedom of expression could not be abridged absent material and substantial interference with discipline and order in the school. *Burnside*, like *Tinker*,[11] was a "symbolic speech" case, where students were suspended from school for wearing "freedom" buttons. The Supreme Court cited *Burnside* when it held that:

> In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in of the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' the prohibition cannot be sustained.

*Tinker, supra*, 393 U.S. at 509, 89 S.Ct. at 738, *citing Burnside, supra*, 363 F.2d at 749.

Finally, despite Judge Wisdom's statement that the decision "require[d] us to break no new ground," in *University of Southern Mississippi* itself we foreshadowed the Supreme Court's reversal of the Second Circuit's decision in *Healy v. James*, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972).[12] In *University of*

---

**11.** In *Tinker,* the Supreme Court held that the suspension of students for wearing black armbands to protest the Viet Nam War violated the students' rights to freedom of expression. *Id.,* 393 U.S. at 514, 89 S.Ct. at 740.

**12.** In *Healy,* the Supreme Court held that a state university's refusal to grant official recognition to a group of students seeking to form a university chapter of the Students for a Democratic Society (SDS) violated the students' rights under

*Southern Mississippi,* we held that the University's denial of official recognition to a chapter of the Mississippi Civil Liberties Union violated the First Amendment. *Id.,* 452 F.2d at 568. The District Court had found that the "litigious orientation" of the MCLU might result in frivolous, vexatious and harassing lawsuits likely to impede the legitimate function of the University. We disagreed, after stating the following standards:

> Student rights of free expression may be prohibited only if they 'materially and substantially [interfere] with the requirements of appropriate discipline in the operation of the school.' ... When the restriction upon student expression takes the form of an attempt to predict in advance the content and consequences of that expression, it is tantamount to a prior restraint and carries a heavy presumption against its constitutionality.

*University of Southern Mississippi, supra,* 452 F.2d at 566, *quoting Tinker, supra,* 393 U.S. at 509, 89 S.Ct. at 738. We distinguished the Second Circuit's decision in *Healy* on its facts,[13] while pointing out that we in no way implied our approval of that decision.

These three decisions required this Court to extend its own precedent as well as that of the Supreme Court to encompass the then-timely First Amendment problems of days gone by. Our earlier decisions, and certainly their Supreme Court counterparts, remain such an effective weapon against the infringement of fundamental

rights that our task today is small in comparison. Moreover, we need not take the extra step of extending those precedents to today's problem by ourselves, for three other Circuit Courts and at least two federal District Courts have marked our way.[14] In treading the First Amendment path, we are ever-mindful of the words of Mr. Justice Jackson in *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 640–42, 63 S.Ct. 1178, 1186–87, 87 L.Ed. 1628, 1639 (1943):

> Struggles to coerce uniformity of sentiment in support of some end thought essential to their time and country have been waged by many good as well as by evil men.... As governmental pressure toward unity becomes greater, so strife becomes more bitter as to whose unity it shall be.... The ultimate futility of such attempts to compel coherence is the lesson of every such effort from the Roman drive to stamp out Christianity as a disturber of its pagan unity, ... down to the fast failing efforts of our present totalitarian enemies. Those who begin coercive elimination of dissent soon find themselves exterminating dissenters. Compulsory unification of opinion achieves only the unanimity of the graveyard.
>
> \*    \*    \*    \*    \*    \*
>
> ... the First Amendment to our Constitution was designed to avoid these ends by avoiding these beginnings.
>
> \*    \*    \*    \*    \*    \*

---

the First Amendment. The *Healy* Court, though it did not specifically rely upon *University of Southern Mississippi,* applied almost precisely the same test. *See* further discussion of *Healy, infra.*

**13.** We distinguished the Second Circuit's *Healy* from *University of Southern Mississippi* on the basis that "SDS has not expressed any commitment to a policy of litigation, and certain members of SDS have advocated disruption as a means of achieving its goals. [Furthermore], ... SDS actually demonstrated a refusal to abide by University procedures for dispute resolution when it behaved defiantly during a court-structured hearing to determine its status." *University of Southern Mississippi, supra,* 452 F.2d at 567. We think it telling that despite the

apparent presence of these factors in the Second Circuit's opinion, the Supreme Court still opted for reversal on First Amendment grounds. *See* further discussion of *Healy, infra.*

**14.** *See* discussion of *Gay Students Organization of the University of New Hampshire v. Bonner,* 509 F.2d 652 (1st Cir.1974); *Gay Alliance of Students v. Matthews,* 544 F.2d 162 (4th Cir. 1976); *Gay Lib v. University of Missouri,* 558 F.2d 848 (8th Cir.1977), *cert. denied,* 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 789, *reh. denied,* 435 U.S. 981, 98 S.Ct. 1632, 56 L.Ed.2d 74 (1978), *infra. See also Student Coalition for Gay Rights v. Austin Peay University,* 477 F.Supp. 1267 (M.D.Tenn.1979); *Wood v. Davison,* 351 F.Supp. 543 (N.D.Ga.1972).

... [f]reedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order.

*Id.*

### Official Recognition and First Amendment Freedoms

The District Court held that the First Amendment right of freedom of association "does not protect mere friendship or personal affinity but rather protects the right to join with others in the advocacy of beliefs or the exercise of other rights protected by the First Amendment." Because it found that GSS's message was "mere friendship and a sharing of concerns about classes and professors," the Court concluded that appellants' right to freedom of association under the First Amendment was not infringed. This fact finding precluded it from reaching any other First Amendment issues, so the Judge thought. We have already determined that the Court erred in finding that TAMU's reasons for the denying recognition to GSS were not based on the content of its message. Thus, we need only determine whether such a denial violated appellants' rights under the First Amendment.

In *Healy v. James*, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972), the Supreme Court was faced with a situation nearly identical to that before us today. In *Healy*, a state supported college refused to recognize a group of students who wished to organize a local chapter of Students for a Democratic Society (SDS) during the late 60s, when SDS groups on some campuses had been a "catalytic force" in "widespread civil disobedience" on college campuses. *Id.*, 402 U.S. at 170–72, 92 S.Ct. at 2341. The benefits of recognition in *Healy* were nearly identical to the benefits of which GSS was deprived, as was at least one of the asserted reasons for the denial: "the organization's philosophy was antithetical to the school's policies." *Id.*, 402 U.S. at 175–76, 92 S.Ct. at 2343. The students

sued, basing their claims on the denial of First Amendment rights of expression and association. *Id.*, 402 U.S. at 177, 92 S.Ct. at 2344.

The Court began its analysis by pointing out that while a university certainly has the right to "'prescribe and control conduct'" on its campus, the "'vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'" *Id.*, 402 U.S. at 180, 92 S.Ct. at 2345–46, *citing Tinker v. Des Moines Independent School District*, 393 U.S. 503, 507, 89 S.Ct. 733, 737, 21 L.Ed.2d 731, 738 (1969); *Shelton v. Tucker*, 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231, 236 (1960). Perceiving college classrooms and their "surrounding environs as a 'marketplace of ideas,'" the Court reaffirmed "this Nation's dedication to safeguarding academic freedom." *Healy, supra*, 408 U.S. at 180–81, 92 S.Ct. at 2346, *quoting Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629, 640 (1967).

In *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), Justice Harlan for a unanimous Court articulated the basis for recognizing the freedom of association that has since become firmly embodied in our First Amendment jurisprudence:

Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association.... It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech.... Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny.

*Id.*, 357 U.S. at 460–61, 78 S.Ct. at 1163, 1171. Thus, as the *Healy* Court held, free-

dom of association is "implicit" in the specified First Amendment freedoms. *Healy, supra*, 408 U.S. at 181, 92 S.Ct. at 2346.

In *Healy* the Court stated that there "can be no doubt that denial of official recognition, without justification, to college organizations burdens or abridges" the First Amendment freedom of association. *Id.*[15] The university bears the burden of justifying its decision rejecting the application for recognition. *Id.*, 408 U.S. at 184, 92 S.Ct. at 2347. Although university authorities have a legitimate interest in prohibiting student activities intended to and likely to incite or produce imminent lawless action or those that materially and substantially disrupt the work and discipline of the school, the record in *Healy* disclosed only an unsubstantiated fear or apprehension that recognition of the group would produce such a result. *Id.*, 408 U.S. at 188–190, 92 S.Ct. at 2349–50, *citing Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430, 434 (1969); and *Tinker, supra*, 393 U.S. at 513, 89 S.Ct. at 740. Thus, the Court found the University's asserted reasons for denying recognition insufficient to meet its "heavy burden" of justifying the infringement on the students' right to freedom of expression. *Healy, supra*, 408 U.S. at 184, 92 S.Ct. at 2348.[16]

We think that the standards enunciated in *Healy* are precisely on point in this case. We therefore turn to TAMU's asserted reasons for denying recognition to GSS to determine their constitutionality under *Healy*.

### Asserted Justifications

In his letter denying GSS official recognition, Dr. Koldus stated that GSS's goals and purposes were not consistent with the philosophy and goals of TAMU. This alone as a reason for denying recognition is clearly forbidden by *Healy*, where the Court specifically rejected for constitutional purposes the college president's statement that SDS's philosophies of destruction, violence and disruption were " 'counter to the official policy of the college.' " *Healy, supra*, 408 U.S. at 187, 92 S.Ct. at 2349. The Court held that:

15. The "primary impediment to free association flowing from nonrecognition is the denial of the use of campus facilities for meetings and other appropriate purposes." *Healy, supra*, 408 U.S. at 181, 92 S.Ct. at 2346. The Court also observed that use of campus bulletin boards and the school newspaper were essential to the group's associational interest as devices for communication. *Id.* Finally, "the organization's ability to participate in the intellectual give and take of campus debate, and to pursue its stated purposes, is limited by denial of access to the customary media for communicating with the administration, faculty members, and other students." *Id.*, 408 U.S. at 181–82, 92 S.Ct. at 2346.

In the instant case, the benefits of recognition denied to GSS included all of the above, as well as the right to receive a portion of the TAMU bookstore profits. The *Healy* Court stated that the record did not enable it to consider the inability to receive funding from the school budget a factor. In this case, then, GSS was denied at least one additional benefit specifically found lacking in *Healy*. *Healy, supra*, 408 U.S. at 182 n. 8, 92 S.Ct. at 2346 n. 8. *See also* list of benefits of gaining recognition at note 3, *supra*.

16. The Court remanded, however, because it was unable to ascertain from the record wheth- er the college's requirements for recognition included that the group formally affirm its willingness to abide by reasonable campus regulations, or whether the group intended to abide by those regulations. Thus, the Court concluded that recognition "may be denied to any group that reserves the right to violate any [constitutionally] valid campus rules with which it disagrees." In *Healy*, however, on-campus SDS representatives had "equivocated" during a hearing before the Student Affairs Committee when asked whether the group could ever envision interrupting a class and when asked other similar questions. This, coupled with SDS participation in unrest on other campuses, raised the "considerable question" whether they intended to abide by reasonable regulations regarding campus disruption. *Id.*, 408 U.S. at 193–94, 92 S.Ct. at 2252–53.

In the instant case, on the other hand, Dr. Skinner specifically testified that GSS was willing to agree to all reasonable restrictions imposed by TAMU. Moreover, there was no testimony that gay organizations on other campuses had failed to comply with university regulations. Perceiving no evidence in this case that GSS intends to flaunt constitutionally valid TAMU regulations, we see no reason to follow the *Healy* Court's lead in remanding on this issue.

The mere disagreement of the President with the group's philosophy affords no reason to deny it recognition. As repugnant as these views may have been ..., the mere expression of them would not justify the denial of First Amendment rights. Whether petitioners did in fact advocate a philosophy of 'destruction' thus becomes immaterial. The College, acting here as the instrumentality of the State, may not restrict speech or association simply because it finds the views expressed by any group to be abhorrent.

*Id.*, 408 U.S. at 187–88, 92 S.Ct. at 2349.

Dr. Koldus proffered two additional, more specific reasons for denying recognition to GSS. First, he stated that because homosexual conduct was illegal in Texas, it would be inappropriate for TAMU to recognize a group likely to "incite, promote, and result" in homosexual acts. Second, he stated that student organizations did not have the "educational experience, the responsibility or the authority to educate the larger public." The District Court did not reach these issues because its findings of fact precluded analysis under any form of heightened scrutiny.[17]

As to TAMU's asserted interest in preventing expression likely to "incite, promote, and result" in then-illegal homosexual activity, we emphasize that while Texas law may prohibit certain homosexual practices, no Texas law makes it a crime to *be* a homosexual. Furthermore, there is no evidence that any illegal activity has taken place as a result of GSS's existence in the past, nor is there any evidence that GSS is an organization devoted to advocacy and incitement of imminent illegal, specifically proscribed homosexual activity. Consistent with *Healy*, we cannot conclude that the "critical line ... between advocacy and action" has been violated in this case.

We are not alone in reaching this conclusion. In *Gay Students Organization of the University of New Hampshire v. Bonner*, 509 F.2d 652 (1st Cir.1974), the University suspended its earlier recognition of a gay group (GSO) and ordered a strict ban on the group's social functions after a GSO sponsored dance resulted in unfavorable

---

**17.** At oral argument, counsel for TAMU argued that remand for new findings and conclusions would be necessary were we to hold that the District Court erred in failing to apply heightened scrutiny to the facts of this case. We do not agree, for several reasons. First, during trial, the District Court permitted full development of appellees' asserted compelling state interests. Indeed, the case went forward upon an understanding that this was the sole issue before the Court. See discussion at notes 7 and 8, *supra*. Inexplicably, the Court made only passing mention of its conclusions with regard to any of the evidence adduced during the entire trial:

At trial, Defendants did offer evidence that recognition of Gay Student Services would tend to encourage more homosexual conduct, resulting not only in violations of the penal code but also in an increase in the number of persons with psychological and medical problems associated with homosexuality. The Court finds the testimony that male homosexuals pose a significant public health problem because they have greater incidence of venereal disease to be credible. While the compelling need for all state agencies, including Texas A & M University, to discourage this public health risk might be a sufficient basis for denial of recognition of Gay Student Services, the University did not offer this reason as a basis for Koldus' decision in 1976, and the Court does not rely upon this evidence as a basis for its decision.

Instead of basing its conclusions on the theories and evidence before it, the Court adopted TAMU's after-the-fact asserted justification—that recognition was denied because the "fraternal" and "social" nature of GSS was not "consistent with the goals and philosophies" of TAMU. We have already found this conclusion clearly erroneous.

Faced with a fully developed record upon which the trial court deliberately chose not to rule, an eight year old case before us for the second time, and a long overdue request for injunctive relief from violation of a fundamental constitutional right, we decline the opportunity of a second remand. Lest we be criticized for our perhaps overzealous approach, we point out that the Supreme Court did much the same thing in *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 786–87, 98 S.Ct. 1407, 1421, 55 L.Ed.2d 707 (1978). There, the Court merely observed that the lower court had failed to subject the statute at issue to the appropriate level of scrutiny "because of its view that the First Amendment does not apply to appellants' proposed speech," and moved on to examine the state's asserted interests in regulating corporate speech. *Id.*, 435 U.S. at 787, 98 S.Ct. at 1421.

media coverage and criticism by the Governor of New Hampshire. The First Circuit held that the asserted interest in preventing illegal deviate sex acts was insufficient to justify impairment of the group's First Amendment rights because there were neither allegations nor evidence of any illegal or improper acts at GSO's social functions. The Court stated that mere " 'undifferentiated fear or apprehension' of illegal conduct ... is not enough to overcome First Amendment rights, and speculation that individuals might at some time engage in illegal activity is insufficient to justify regulation by the state." *Id.*, 509 F.2d at 662, *citing Tinker, supra,* 393 U.S. at 508, 89 S.Ct. at 733.

Similarly, in *Gay Alliance of Students v. Matthews,* 544 F.2d 162 (4th Cir.1976), the Fourth Circuit concluded that because there was no evidence that the gay group in that case was "an organization devoted to carrying out illegal, specifically proscribed sexual practices," the University's argument that recognition of the group would increase the opportunity for illegal homosexual contact was insufficient to justify the infringement on First Amendment rights. *Id.* at 166. Finally, in *Gay Lib v. University of Missouri,* 558 F.2d 848

(8th Cir.1977), *cert. denied,* 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 789, *reh. denied,* 435 U.S. 981, 98 S.Ct. 1632, 56 L.Ed.2d 74 (1978), the District Court had held that nonrecognition of Gay Lib was justified by medical testimony showing that "recognition of Gay Lib would probably result in ... violations of Missouri [sodomy] law." *Id.* at 850. The Eighth Circuit reversed, holding that even "accepting the opinions of defendants' experts at face value, we find it insufficient to justify a governmental prior restraint on the right of a group of students to associate for the purposes avowed in their statement ... of purposes." *Id.* at 854.

▮ With regard to Koldus' assertion that GSS lacked the experience to educate the public or provide referral services,[18] we point out that even if Koldus was correct in arguing that the University faculty and staff are better equipped to perform these functions, "the state and its agents are forbidden from usurping the students' right to choose." *Gay Alliance, supra,* 544 F.2d at 166. At the heart of the freedom guaranteed by our Constitution is the freedom to choose—even if that choice does not accord with the state's view as to which choice is superior.[19] In *Gay Students Or-*

---

**18.** GSS's education and referral goals are consistent with the aims of the three gay groups in the other Circuit Court cases we have discussed. In *Gay Students Organization,* the group's purposes included:

> 3) In an effort to educate the public about bisexuality and homosexuality, this organization will attempt to affect social changes through public relations measures such as guest lecturers, free literature, films, newspaper articles and radio programs.
> 4) Not the least important reason for establishing a gay organization is to give bisexual and homosexual members of the college community a place to communicate with each other and form discussion groups so that a healthy gay consciousness can evolve among students.

509 F.2d at 654, n. 1.

> Similarly, in *Gay Alliance,* the group sought (a) to develop a supportive community among individuals who believe in the right of self-determination with regard to sexual orientation, [and] (b) to convene educational situations for members of GAS and for members of the university community regarding homosexual life....

544 F.2d at 162.

Finally, in *Gay Lib* the students' aims included:

> (a) To provide a dialogue between the homosexual and heterosexual members of the university community.
> (b) To dispel the lack of information and develop an understanding of the homosexual at the University of Missouri.
> (c) To alleviate the unnecessary burden of shame felt by the local homosexual population.
> (d) To help education, the community and the homosexual to understand the social roles that the homosexual now plays in the community.
> (e) To work closely with established university and community groups for a broader sharing of knowledge and information.

558 F.2d at 850.

**19.** In finding that " 'affiliation of individuals with homosexual activist organizations may have adverse consequences to some individuals involved,' " was an insufficient reason for nonrecognition of a gay group, the Court in *Gay*

*ganization, supra,* 509 F.2d at 660, the First Circuit held that the gay group's

> efforts to organize the homosexual minority, "educate" the public as to its plight, and obtain for it better treatment from individuals and from the government thus represent but another example of the associational activity unequivocally singled out for protection in the very "core" of association cases decided by the Supreme Court.

*Id.* More important, TAMU presented no evidence, nor did the District Court find, that such a goal would "infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education." *Healy, supra,* 408 U.S. at 189, 92 S.Ct. at 2350.

We therefore conclude that none of the reasons for nonrecognition proferred by Dr. Koldus are sufficient to justify the infringement on appellants' First Amendment rights. At trial, however, TAMU asserted yet another alleged justification.[20] It claimed that recognition of GSS would encourage more homosexual conduct, resulting in an increase in the number of persons with the psychological and physiological problems TAMU's experts claimed were more prevalent among homosexuals than among heterosexuals. Thus, TAMU argued that denial of recognition was justifiable as an appropriate means of protecting public health. The District Court stated that this testimony was "credible" al-though it declined to rely on the evidence, pointing out that the University did not offer such a rationale as a basis for Koldus' decision in 1976.

This asserted justification must fail for the same reasons the others did: TAMU has simply not proven that recognition will indeed imminently result in such dire consequences. The speculative evidence offered by the defendants' experts "for which no historical or empirical basis is disclosed," cannot justify TAMU's content-based refusal to recognize GSS. *Gay Lib, supra,* 558 F.2d at 854. We think that on this record TAMU's public health argument is precisely the kind of "undifferentiated fear or apprehension" that the Supreme Court has repeatedly held "is not enough to overcome the right to freedom of expression." *Tinker, supra,* 393 U.S. at 508, 89 S.Ct. at 737; *Healy, supra,* 408 U.S. at 191, 92 S.Ct. at 2351.

In *Gay Lib, supra,* the Eighth Circuit concluded that denying recognition to a gay group "smacks of penalizing persons for their status [as homosexuals] rather than their conduct, which is constitutionally impermissible." *Id.* at 856, *citing Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). We similarly conclude that none of TAMU's asserted justifications are sufficient to overcome the violation of GSS's rights under the First Amendment.

This leaves TAMU's final argument: that because it never created a forum open

---

*Alliance* stated that the "very essence of the First Amendment is that each individual makes his own decision as to whether joining an organization would be harmful to him, and whether any countervailing benefits outweigh the potential harm." 544 F.2d at 165.

**20.** Amicus Lambda Legal Defense & Education Fund argues that it was reversible error for the District Court to admit evidence concerning this "hindsight" justification over GSS's objections. Because the speech violation occurred at the time recognition was denied, Amicus argues, efforts by the state to "fabricate" some compelling interest "years after" the denial should be ignored by the Court. *See Van Ooteghem v. Gray,* 628 F.2d 488, 493 n. 6 (5th Cir.1980) *aff'd in part and remanded on other grounds,* 654 F.2d 304 (1981) (*en banc*) (where court found

that state agency discharged homosexual employee on the basis of constitutionally protected speech, new evidence indicating independent justifications for discharge was irrelevant); *University of Southern Mississippi Chapter of Mississippi Civil Liberties Union v. University of Southern Mississippi,* 452 F.2d 564, 566 n. 3 (5th Cir.1971) (although District Court pointed out *sua sponte* additional justification for nonrecognition of student group, Court of Appeals held that a "justification never raised by the University should [not] play a part in our disposition of this case.") We decline to rule on this evidentiary issue, however, because we find appellee's public health argument substantively insufficient to serve as a compelling justification for infringement in this case.

for First Amendment discourse, no First Amendment violation has taken place.

### Public Forum

The District Court found that TAMU had not "created a forum that is generally open to student groups" because it had traditionally refused to recognize fraternal organizations. Finding that GSS was such a fraternal group, the Court concluded that GSS failed to come within the class of student groups entitled to First Amendment protection under *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). This conclusion was erroneous. As we have already found, GSS was not merely a fraternal group and was not denied recognition on that basis. Rather, we think that GSS is similar to many other student groups that have received recognition in the TAMU forum [21]—except, of course, for the pro-homosexual nature of its message.

■■ Moreover, we do not agree that by virtue of its traditional exclusion of social fraternities, TAMU may escape the constitutional dictates of *Widmar, supra.* In *Widmar* the Supreme Court held that where a state supported university opens its facilities for use by student groups, it may not exclude a particular group based on the content of the group's intended speech absent a compelling state interest and proof that the interest would not be served by a less restrictive alternative. *Widmar, supra,* 454 U.S. at 269–70, 102 S.Ct. at 274, 70 L.Ed.2d at 447–48, *citing Carey v. Brown,* 447 U.S. 455, 461 & 464–65, 100 S.Ct. 2286, 2290 & 2292, 65 L.Ed.2d 263 (1980). As we interpret it, one of TAMU's arguments on appeal is that because it has traditionally refused to recognize fraternal groups, it has not created a "generally open forum" within the meaning of *Widmar;* thus it can refuse to recognize *any* group—not merely fraternal or social groups. In support of this argument, TAMU relies upon *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).[22] Although we have grave doubt that this really presents an arguable contention in view of TAMU's recognition of so many other similar groups, we assume that *Perry* requires us to reach the issue and proceed to determine

21. In addition to the groups described at n. 10, *supra,* we point out that O.A.S.I.S., a TAMU-recognized religious group, was apparently authorized to present the view that homosexuality conflicted with the teachings of the Bible. The group publicized its presentation on TAMU bulletin boards with large posters displaying chained hands, captioned "Homosexuality—Not so Gay." It therefore appears that TAMU did not object to the presentation of negative ideas about homosexuality by its recognized student groups.

22. In *Perry,* the Supreme Court laid out three types of public property "forums" for expressive activity. States may not completely prohibit communication in "quintessential public forums," such as streets and parks. Content based prohibitions on speech in these areas rarely pass constitutional muster, for any regulation must be "necessary to serve a compelling state interest and ... narrowly drawn to achieve that end." Content neutral time, place and manner restrictions that "leave open ample alternative channels of communication" are permissible when "narrowly tailored to serve a significant government interest." *Perry, supra,* 460 U.S. at 46, 103 S.Ct. at 955, 74 L.Ed.2d at

804, *citing Carey v. Brown, supra,* 447 U.S. at 461, 100 S.Ct. at 2290.

Public property that "the state has opened for use by the public as a place for expressive activity" constitutes a forum "generally open to the public." States may not selectively prohibit speech in such a "designated" public forum while it remains "generally open," absent compliance with the same constitutional standards applicable to the more traditional public forum. *Perry, supra,* 460 U.S. at 45, 103 S.Ct. at 955, 74 L.Ed.2d at 805, *citing Widmar v. Vincent, supra,* 454 U.S. at 269–70, 102 S.Ct. at 279.

The third group consists of "[p]ublic property which is not by tradition or designation a forum for public communication.... In addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry, supra,* 103 S.Ct. at 955, 74 L.Ed.2d at 805, *citing United States Postal Service v. Greenburgh Civic Association,* 453 U.S. 114, 129–31 & n. 7, 101 S.Ct. 2676, 2684–86 & n. 7, 69 L.Ed.2d 517 (1981).

whether *Perry* compels reversal or remand—or both.[23]

■■■ In *Perry*, the Supreme Court held that a public school district could constitutionally limit union use of its internal teacher mailbox system to the exclusive bargaining representative of its teachers. The *Perry* Court relied heavily on its finding that the mailbox system was not a "public forum" within the scope of *Widmar*—nor was it a "limited public forum" open only to certain groups or for the discussion of certain subjects. 103 S.Ct. at 955, n. 7, 74 L.Ed.2d at 805, n. 7. We think that even if TAMU has not created a generally open forum, as in *Widmar*, it has at the very least created a limited public forum—which *Perry* tells us is "limited" in the sense that "the constitutional right of access would ... extend only to entities of similar character" to those granted access. *Id.*, 103 S.Ct. at 956, 74 L.Ed.2d at 806. Thus, the *Perry* Court held that if the school had opened its mailboxes to the Cub Scouts or the YMCA, it could not restrict access by "other organizations that engage in activities of interest and educational relevance to students." *Id.* In the instant case, then, because TAMU has opened its forum to other similar student groups, *see* n. 10, *supra*, it may not close the forum to GSS without a compelling reason for doing so.

The conclusion that TAMU is at minimum a limited public forum is buttressed by our recent opinion in *Ysleta Federation of Teachers v. Ysleta Independent School District*, 720 F.2d 1429, 1433 (5th Cir.1983), where we had occasion to interpret and apply *Perry* to a slightly different fact situation. In *Ysleta*, an employee organization's access to the school district's internal mail system was suspended by the school superintendent, who stated that certain materials distributed in the boxes by the appellant did not accord with his interpretation of school policy on a particular issue. *Id.* at 431. We began by recognizing that under *Perry*, the internal mail system of a public school is not a traditional public forum. *Id.* at 1432. We added, however, that such a mail system might become a designated public forum if the system is open for use by the general public. Similarly, it might become a "limited public forum by designation" if the school opens it for use by certain groups or for the discussion of certain subjects. *Id.*, citing *Perry*, *supra*, 103 S.Ct. at 955 & n. 7, 74 L.Ed.2d at 805 & n. 7. We concluded that the Ysleta mail system was a "limited public forum by designation," for reasons similar to those that convince us that *Perry* presented a different forum than that we confront in the instant case.[24]

More important, and in our opinion dispositive, is the fact that *Perry* squarely held that if the selective access policy adopted by the *Perry* schools functioned to "discourage one viewpoint and advance another," strict scrutiny would apply "regardless of whether a public forum [was] involved." *Perry*, *supra*, 103 S.Ct. at 957, 74 L.Ed.2d at 807. The five member majority concluded that the schools' denial of access to all but one union was based on the unions' "status," i.e., rival unions as opposed to exclusive bargaining unit, not their views.[25] Concluding that the access

---

**23.** Since the issue is not before us in this appeal, we do not question the constitutionality of TAMU's exclusion of fraternal groups due to their "social," and as TAMU argues "unprotected" nature.

**24.** We readily distinguished *Perry* on the basis that in that case "there was no specific policy or practice that the mail system be open to the general public or to employee organizations." *Id.*, citing *Perry*, *supra*, 103 S.Ct. at 956–57, 74 L.Ed.2d at 806–07. By contrast, the Ysleta School District had a written policy making access to the mail system available to all employee organizations once certain procedural filing requirements were met. *Ysleta*, *supra*, 720

F.2d at 1433. The "filing requirements," though not specifically addressed in our opinion in *Ysleta*, are comparable to TAMU's requirement that only recognized groups are permitted access to its forum.

**25.** Justice Brennan, joined by three other Justices, dissented strongly, believing that the majority's First Amendment analysis was flawed by its initial focus on the public forum doctrine. The dissent favored the direct approach to what it termed "discrimination [that] amounts to censorship"—a clear content-based violation of the First Amendment. The majority was apparently unconvinced. It is unclear after *Perry*, then, whether application of the public forum doc-

policy was viewpoint neutral, the Court questioned only whether the restriction was "reasonable in light of the purpose which the forum at issue serves." *Id.* Contrastingly, in this case TAMU admits and the District Court found that TAMU allows other views of homosexuality to be presented on its campus. Moreover, the record shows that TAMU recognized other groups that sought acceptance and integration of their particular lifestyle in the University community.[26] We think that the denial of recognition to a student group wishing to express its own views on the same or similar subjects is clearly the sort of viewpoint based discrimination forbidden by *Perry* in any type of public forum.

This leads us to consider whether any of the asserted reasons for the denial of recognition constitute a sufficiently narrow and compelling state interest to uphold the denial under the public forum analysis we have discussed *supra.* We reach and decide the issue for the same reasons discussed at footnote 17, *supra.* As already determined, all of TAMU's asserted reasons for nonrecognition were insufficient to justify infringement of GSS's rights under the straightforward First Amendment anal-

ysis. For the same reasons, they are insufficient to state a compelling interest for content-based regulation in TAMU's forum.

### Damages

▬▬▬ GSS also asserts that the District Court erred in finding that any award of damages was barred by the Eleventh Amendment.[27] Appellants urge us to "carefully craft" a judgment wherein monetary damages would come from bookstore profits or from student service fees, neither of which funds are kept in the state treasury. They cite, however, no authority that convinces us that a federal court should exercise any such power to avoid the proscription of the Eleventh Amendment. We are convinced that the District Court properly applied Supreme Court precedent in *Zentgraf v. Texas A & M University,* 492 F.Supp. 265 (S.D.Tex.1980), a sex discrimination suit brought against TAMU. After examining the legal relationship between the state and TAMU,[28] the Court concluded that because TAMU was an alter ego of the State of Texas, "any suit against the University or its officials for monetary relief is a suit against

trine set out therein must precede direct First Amendment analysis in cases where the doctrine is implicated.

26. The District Court found:

Texas A & M University accepts admitted homosexuals as students and employs admitted homosexuals. Several University professors have invited members of Gay Student Services to speak to their classes. The Court finds that Texas A & M University's refusal to extend official recognition to Gay Student Services was not based upon the content of Gay Student Services' ideas about homosexuality ... because the University permits ideas about homosexuality to be freely presented by speakers in University classrooms.

Of course, as we have already found, the finding that denial of recognition was not based on the homosexual nature of GSS is clearly erroneous. Although the record supports the finding that several classes have had speakers on homosexuality, the conclusion that this factor alone makes TAMU a place where ideas about homosexuality are "freely presented" is clearly belied by the fact that recognition was denied to GSS. *See also* discussion regarding other student groups at nn. 10 & 21, *supra.*

27. The Eleventh Amendment prohibits suits for monetary relief by private parties in federal court against a state and its agencies, absent waiver by the state. The Supreme Court has construed the Eleventh Amendment to bar suits for money damages such as this one under § 1983 against entities and officials so closely affiliated with the state as to make the state the real party in interest. *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979); *Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978); *Mount Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

28. TAMU was created by the Texas Legislature in 1871. The statutes authorizing its operation and providing for its governance are codified at Tex.Educ.Code §§ 85.01 *et seq.* (Vernon Ann.). The University's Board of Regents are appointed by the Governor with the advice and consent of the Senate. *Id.* § 85.11. TAMU's operating expenses are paid by legislative appropriations. *See Zentgraf, supra,* 492 F.Supp. at 272.

the state and thereby barred by the Eleventh Amendment." *Id.* at 271–72.

### Conclusion

TAMU's refusal to recognize GSS as an on-campus student organization impermissibly denied appellants their First Amendment rights.[29] The judgment of the District Court is therefore reversed and the case is remanded for the entry of appropriate injunctive and declaratory relief in accordance with this opinion.

REVERSED AND REMANDED.

---

**29.** We therefore need not reach GSS's argument that it was denied Due Process or the Amicus claim that GSS was denied Equal Protection.