Donald F. BAKER, Plaintiff,

v.

Henry WADE, Defendant.

No. CA 3–79–1434–R.

United States District Court,
N.D. Texas,
Dallas Division.

July 1, 1985.

James C. Barber, Dallas, Tex., for plaintiff.

Joseph G. Werner and Kent Hofmeister, Dallas, Tex., for Holt.

Sue Lagarde, C.J. Baldree, Dallas, Tex., for Wade.

Chas Bundren, Dallas, Tex., for Hill, intervenor.

Michael P. Davis, El Paso, Tex., for Rodriguez.

Lonny F. Zwiener, Austin, Tex., for State of Tex.

## SUPPLEMENTAL OPINION

BUCHMEYER, District Judge.

This opinion supplements the decision in *Baker v. Wade*, 553 F.Supp. 1121 (N.D.Tex. Aug. 17, 1982).[1]

It concerns two motions—a "Motion to Set Aside Final Judgment and Reopen the Evidence" and a "Motion to Intervene and Substitute Class Representative"—filed on behalf of Danny Hill, the District Attorney for the 47th Judicial District (Potter County, Texas) by Wm. Charles Bundren, a Dallas attorney who represents both District Attorney Hill and a group called "Dallas Doctors Against AIDS."[2]

Neither Hill nor Bundren—nor Dallas Doctors Against AIDS ("DDAA")—participated in the June 1981 trial of this case. Nor did they attempt to represent the defendants in this controversy until April 1983, almost six months after the final judgment was entered on September 30, 1982. For the following reasons, their motions are **DENIED**.

### 1. THE FACTUAL BACKGROUND

When this case was tried (June 1981), it was defended by the Attorney General of the State of Texas; by Henry Wade, the District Attorney of Dallas County; and by Lee Holt, the City Attorney of Dallas. Wade and Holt had been certified as representatives of a defendant class consisting of "all district, county and city attorneys in the State of Texas responsible for the enforcement of Texas Penal Code Ann. § 21.-06 ('Homosexual Conduct')." (553 F.Supp. at 1125.)

This Court's decision was rendered on August 17, 1982. It held that § 21.06—which prohibits private, consensual sodomy between homosexuals—was unconstitutional because it violated the constitutional rights of privacy and equal protection. (553 F.Supp. 1135–45.) After a hearing concerning attorneys fees (42 U.S.C. § 1988), final judgment was entered on September 30, 1982.

The Potter County District Attorney's Office (both Danny Hill and his predecessor) elected not to participate in the trial of this case.[3] Neither Wm. Charles Bundren nor "Dallas Doctors Against Aids" participated in the trial; and, neither requested leave to appear as amicus curiae before

---

**1.** Affirmed on other grounds, 743 F.2d 236 (5th Cir. Sept. 21, 1984), application for en banc hearing granted (5th Cir. Jan. 28, 1985). But see *Hardwick v. Bowers*, 760 F.2d 1202 (11th Cir.1985).

**2.** Another Dallas lawyer, Donovan Campbell, Jr., presently represents Dallas Doctors Against Aids ("DDAA") before the Fifth Circuit in the appeal of this case. He was "substituted" for Wm. Charles Bundren as the DDAA attorney on July 26, 1983, several months after Bundren had

filed pleadings both on behalf of DDAA and District Attorney Hill before the Fifth Circuit. Bundren was an incorporator of DDAA; Donovan Campbell, Jr., is a trustee of DDAA, and the son of Dr. Donovan Campbell, another "Dallas Doctors Against Aids" trustee.

**3.** Hill's predecessor, Thomas A. Curtis, was notified that any motion to intervene must be filed by September 1, 1980. (553 F.Supp. 1125 at n. 1).

this Court's decision (August 17, 1982) or before the entry of final judgment (September 30, 1982). There were no motions for new trial under Fed.R.Civ.P. 59(b)—by Hill, by Bundren or by DDAA—or, indeed, by anyone else.[4]

On October 28, 1982, a notice of appeal was filed by Potter County District Attorney Danny Hill.[5] On November 1, 1982, the State of Texas filed its notice of appeal. Neither the City of Dallas nor the County of Dallas appealed. Then, by letter dated March 9, 1983, the Texas Attorney General advised the Clerk of the United States Court of Appeals for the Fifth Circuit that the State had "concluded not to further prosecute this appeal." A formal motion to withdraw the State's appeal was filed on March 18, 1983, and it was subsequently granted.

### Dallas Doctors Against Aids

The group known as "Dallas Doctors Against Aids" and its attorney, Wm. Charles Bundren, first appeared publicly in this case on February 23, 1983, when they sought leave to file an amicus brief with the Fifth Circuit. On March 10, 1983—one day after the State of Texas gave notice

that it was dismissing its appeal[6]—the DDAA attorney, Wm. Charles Bundren, filed a motion with the Fifth Circuit to be substituted as counsel of record for Potter County District Attorney Danny Hill.[7] This was granted, and Bundren represented both Hill and DDAA before the Fifth Circuit until July 26, 1983, when Donovan Campbell, Jr., filed an appearance of counsel for DDAA (see footnote 2).

However, on April 12, 1983, Wm. Charles Bundren—solely as the attorney for Potter County District Attorney Danny Hill—filed a "Motion to Set Aside Final Judgment and Reopen the Evidence" and a "Motion to Intervene and Substitute [Danny Hill] as Class Representative." So, before this Court, Bundren represents only Hill, and not DDAA.[8]

### The AIDS Motions

The pending motions purport to be based upon a concern about "AIDS"—the "lethal and epidemic disease of Acquired Immunological Deficiency Syndrome." AIDS is, at present, a mysterious, incurable, and often fatal disease—which, to date, has primarily affected homosexual males and, apparently to a lesser degree, intravenous drug users

---

**4.** The *only* post-trial motion—besides those relating to attorneys fees and the form of judgment—was the defendant Wade's "Objections to the Court's Findings of Fact and Conclusions of Law" (filed September 10, 1982).

**5.** No evidence had been presented at trial that Potter County (Amarillo) had a large or politically active group of homosexuals. Nor was there any evidence that District Attorney Danny Hill or his predecessor had vigorously enforced § 21.06. (553 F.Supp. at 1126–34.)

**6.** The Texas Attorney General sent a copy of his March 9, 1983 letter dropping the State's appeal both to District Attorney Hill and to Wm. Charles Bundren, the DDAA attorney. Brief of Appellee, Appendix 2.

**7.** On March 18, 1983, an original "Petition for Writ of Mandamus" was filed in the Texas Supreme Court seeking to force the Texas Attorney General to prosecute the State's appeal in this case; in this unsuccessful proceeding—filed in the names of Potter County District Attorney Danny Hill, State Senator John Leedom (Dallas) and State Representative Bill Ceverha (Dallas)— Hill was represented by R. Gregory Lamb of the Washington Legal Foundation in Dallas.

**8.** This Court has some concern about just who is the "real party in interest" as to the pending motions. Although both this Court and the Fifth Circuit have been asked to take "judicial notice" of hearsay articles in newspapers and general news magazines—such as Newsweek and the Dallas-Ft. Worth Gay News (Brief of Appellee, pp. 39, 46)—*which contain statements that DDAA is the real party behind the present motions,* it is not proper for this Court to consider such hearsay. Therefore, this Court will not indulge in speculation as to why District Attorney Hill filed his notice of appeal (see footnote 5), but has not even executed an affidavit in support of the pending motions. Nor will this Court consider hearsay statements in newspapers and magazines that "Dallas Doctors Against AIDS, a group of about 25 who say their mission is informative and research oriented," have become active in *Baker v. Wade*—and that the legal expenses in this case, before both this Court and the Fifth Circuit, will be borne by DDAA and Mr. Bundren's law firm. 69 ABA Journal 1014–15 (August 1983). It is simply not necessary to reach any "standing" issue in order to determine the pending motions.

(drug addicts), Haitians, and hemophiliacs. (Affidavit of Dr. Kevin Murphy, Brief of Appellee, Appendix 9.)

In essence, the motions contend that "the public health and safety of all citizens of Texas will be harmed if the spread of AIDS is not stopped." And, they argue—*quite seriously*[9]—that § 21.06 is desperately needed to combat the AIDS menace, *so the State of Texas will be able to fight AIDS by exacting $200 fines from persons who engage in private, consensual homosexual conduct.*[10]

Hill-Bundren-DDAA maintain that "the acknowledged statistics show that homosexuals have accounted for a vastly disproportionate share of the AIDS cases (95% to 100% at the time of trial in this case; approximately 72% more recently)." And, they contend:

> "Rule 60(b)(2) recognizes a party's right to seek relief from a judgment on the basis of newly discovered evidence. *AIDS is newly discovered evidence.* The incidents of AIDS in persons who engage in homosexual conduct and its deathly public health threat are newly discovered evidence. *Although AIDS had been discovered at the time of trial, its direct relationship to homosexual conduct was not fully established.* AIDS is recognized by the medical community as one of the most deadly and proliferic (sic) diseases in recent memory and is directly related to homosexual conduct. The Court should consider the public health dangers which AIDS poses and its relationship to the type of conduct which is before the Court in this action...." (Brief in Support of Motion to Set Aside Final Judgment and Reopen the Evidence, p. 4) (emphasis added).

In addition to "numerous magazine articles concerning AIDS and other sexually transmitted diseases in homosexual individuals," the motions are "supported" by certain affidavits, including that of Dr. Paul Cameron. There are no affidavits, however, from the original defendants or their attorneys in support of the pending motions.

In opposition, the plaintiff, Donald F. Baker, contends that there is no "newly discovered evidence"—and that **Hill-Bundren-DDAA are merely dissatisfied with this Court's decision, so they want to try the case again.** In addition, the plaintiff has submitted affidavits from experts who explain why, in their opinion, the Hill-Bundren-DDAA assertions concerning AIDS are simply not valid. (Brief of Appellant, Appendix 4-9.) For example, Dr. Kevin Murphy of Dallas, who is the "Special Consultant on Acquired Immune Deficiency Syndrome" to the Texas Department of Health, describes the presently known characteristics of AIDS:

> "(a) [AIDS] is an explosively epidemic illness, characterized by person-to-person spread suggestive of a transmissible agent;
>
> "(b) it is highly associated with specific risk groups: *gay men,* recreational intravenous (IV) *drug users, Haitian* refugees and nationals, and, more recently, infants born to affected mothers or mothers who are Haitian or use IV drugs, and *hemophiliacs;* in addition, a few cases have been reported in recipients of transfused blood....
>
> "(c) the mortality of AIDS is very high, but the ultimate mortality of cases followed for a sufficient period of time is not yet known;
>
> "(d) the geographic distribution of AIDS is highly focal but spreading; it is first of all an American and Haitian disease. Cases in Europe have been few

---

9. There may be an appropriate term for this. See *Appendix A,* excerpt from Brief for Appellant Danny Hill (July 6, 1983), page 21, line 6, *the very first word.*

10. "There are practical difficulties in prosecuting persons under § 21.06 for private homosexual conduct. If the acts are between two people in private, there may be no witnesses to testify

at trial...." (553 F.Supp. at 1126.) Indeed, *the original defendants contended that "this case should be dismissed because no one is ever prosecuted under this statute."* (553 F.Supp. at 1124.) Hill-Bundren-DDAA make a similar argument before the Fifth Circuit. (Brief for Appellant, pp. 7–12).

and have generally been associated with contact with Americans....

"(e) Sexual contact with a case is significantly associated with transmission of AIDS. This is clearly demonstrated among gay men, but cases also occur among heterosexual contacts of IV drug users who do not use drugs themselves. However sexual contact is not the only means of transmission; blood-borne transmission appears to be a second major mode of transmission.

"(f) The risk of acquiring AIDS among gay men is directly proportional to the number of different sexual partners and the proportion of sexual partners who are anonymous....

　　·　　　·　　　·　　　·　　　·

"(h) There is no evidence to suggest that AIDS 'began' in the homosexual community, although this unfortunate population has served as an important sentinel for a disorder that obviously affects other populations as well...."

The plaintiff's affidavits also argue that "to criminalize homosexuality is possibly the worst conceivable way to try and solve the problem of AIDS" because this simply serves "to drive the whole issue underground, so that surveillance and early diagnosis will be made that much more difficult, if not impossible." (Affidavit of Dr. Peter W.A. Mansell, Brief of Appellant, Appendix 4.)

However, the plaintiff and Hill-Bundren-DDAA do agree upon one thing: the epidemic of AIDS began in 1979 and it was first recognized by the medical profession about May or June of 1981. *See*, e.g., Affidavits of Dr. Kevin Murphy and Dr.

Sigmund Friedman. Indeed, Dr. Friedman—an expert for Hill-Bundren-DDAA—states that "*AIDS did not become widely known in the medical profession until toward the end of 1981*, approximately coincident with the December 10, 1981, issue of *The New Journal of Medicine* and several important articles therein."

### 1983 Legislative History

Hill-Bundren-DDAA assert that "the courts should defer to the wisdom and counsel of the people's elected officials rather than substituting one judge's personal viewpoints on public policy." (Brief of Appellant, p. 35.) However, they have conveniently ignored what happened in the 1983 session of the Texas Legislature concerning § 21.06. Indeed, their very same "AIDS arguments" were presented to—*and rejected by* —the Texas Legislature in March and April of 1983.[11] Accordingly, this Court takes judicial notice of the following *additional* legislative history concerning § 21.06:[12]

On March 11, 1983, State Representative Bill Ceverha introduced HB 2138.[13] Wm. Charles Bundren, the attorney for DDAA, assisted Ceverha in drafting this bill. HB 2138, in essence, would have broadened § 21.06 to prohibit *any* homosexual conduct or "sexual contact."[14] And, *punishment was to be dramatically increased:* 2–10 years imprisonment and a $5,000 fine for the first offense ("third-degree felony"); 2–20 years imprisonment and a $10,000 fine for subsequent offenses ("second degree felony"). Tex.Penal Code Ann. §§ 12.33 and 12.34 (Vernon 1974).

11. The Texas Attorney General gave advance notice of his decision to drop the State's appeal in this case not only to District Attorney Hill, but also to Bundren and DDAA (see footnote 4). Therefore, it seems reasonable to assume that the same or similar arguments—based upon the "AIDS epidemic"—were also presented to, and rejected by, the Texas Attorney General before he dismissed the State's appeal.

12. *Baker v. Wade*, 553 F.Supp. 1125–26, 1150–51. *See New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 3350, 3355, 73 L.Ed.2d 1113 (1982).

13. Representative Ceverha was one of the three parties who attempted, unsuccessfully, to force the Texas Attorney General to continue the appeal in this case by means of the petition for mandamus discussed in footnote 7.

14. "Actually, the legislature did not prohibit *all* homosexual conduct by § 21.06. That statute ... § 21.06 does not prohibit homosexuals from kissing, hugging, or sexually stimulating their partners with hands and fingers." (553 F.Supp. at 1151.)

On April 19, 1983, the House Criminal Jurisprudence Committee conducted hearings on HB 2138. Representative Ceverha presented testimony from *Dr. Paul Cameron* of Nebraska, Dr. Clem Mueller of Dallas, and two Dallas policemen. The Committee also heard testimony from the plaintiff in this case (Don Baker), his attorney (James C. Barber), and *Dr. W.A. Mansell* of Houston.

Dr. Cameron and Dr. Mansell gave conflicting testimony—similar to that contained in their affidavits filed in this Court (and before the Fifth Circuit). Specifically, Dr. Cameron testified, in substance, that AIDS is directly related to, and spread by, homosexual conduct—and that HB 2138 was needed to prevent homosexual conduct from destroying this country's public health. (Brief for Appellant, pp. 49–50). In contrast, Dr. Mansell testified that "there is no absolute evidence as to whether or not AIDS is directly related to homosexual conduct" ... that "the likelihood of a gay person spreading the disease to a straight person by sexual contact is obviously very slight" ... and that "it would be a public health disaster if the Court were to reverse its previous decision in this case, or if the proposed sodomy bill is passed by the Texas Legislature." (Brief of Appellee, Appendix 4.)

After the Committee heard this testimony—*the same "AIDS evidence" which "supports" the motions presented to this Court*—the Committee rejected the Hill-Bundren-DDAA arguments: Chairman Wayne Peveto (Orange) moved to refer HB 2138 to subcommittee; this was done and the bill died there at the close of the 1983 session in May.[15]

## 2. THE MOTION TO REOPEN THE EVIDENCE

The "Motion to Set Aside Final Judgment and Reopen the Evidence" is, of course, based upon Fed.R.Civ.P. 60(b). Specifically, claims are made under Rule 60(b)(2) ("newly discovered evidence which by due diligence could not have been discovered *in time to move for a new trial* under Rule 59(b)"); under Rule 60(b)(3) ("fraud ... misrepresentation, or other misconduct"); and under Rule 60(b)(6) ("any other reason justifying relief from the operation of the judgment").

■ This Court has jurisdiction to consider the motion to reopen the evidence even though the case is pending on appeal. *Standard Oil Co. v. United States,* 429 U.S. 17, 97 S.Ct. 31, 50 L.Ed.2d 21 (1976). However, a Rule 60(b) motion is "an extraordinary motion," addressed to the discretion of the trial court. The "desirability of orderliness and predictability in the judicial process speaks for caution in the reopening of judgments." *Fackelman v. Bell,* 564 F.2d 734, 734 (5th Cir.1977); *Johnson Waste Materials v. Marshall,* 611 F.2d 593, 597 (5th Cir.1980). Although it may be normal for the losing party—or, here, persons who did not even participate in the trial, but who vehemently disagree with this Court's decision—to wish to retry the case and present additional evidence, permitting this "would lead to neverending litigation." *Ramsey v. United Mine Workers,* 481 F.2d 742, 753 (6th Cir.1973).

■ Accordingly, it is clear that the present motion *does not* meet the requirements of Rule 60(b). In particular, the "evidence" relied upon is not "newly discovered evidence" ... there has been no showing that the "evidence" could not have been discovered, in the exercise of "due diligence," in time to move for a new trial under rule 59(b) ... and the supposed "new evidence" is certainly not sufficient to warrant a new trial or to change the result in this case. In addition, contrary to the claims of Hill-Bundren-DDAA, there was no "fraud or misrepresentation" in testimony given at trial—and there are no "other reasons" for granting relief under Rule 60(b).

15. Representative Ceverha also introduced a bill that would have banned homosexuals from jobs in teaching, health care and other fields. He supported this legislation by the same "AIDS evidence. That bill, too, died in committee in May of 1983.

### The "Evidence"

When this motion was filed on April 12, 1983, it requested this Court to consider the 41 "medical articles" attached to the motion.[16] However, there was no supporting affidavit filed to establish that these articles appeared in periodicals considered authoritative and reliable in the medical profession. Fed.R.Evid. 803(18). In fact:

(i) eight of the 41 articles were from general news or science magazines, such as Time, Newsweek, Saturday Evening Post, Science News and The Homosexual Network Magazine;

(ii) of the remaining 33 articles, 9 were published before the trial in this case (June 1981), another 12 were published before the judgment was entered (September 30, 1982), and *12 articles published later.*

After two months, on June 8, 1983, an affidavit was filed which did establish that "Cutis, The New England Journal of Medicine, The Western Journal of Medicine, The Postgraduate Medical Journal, and the American Journal of Public Health," and perhaps the Anals of Internal Medicine, were medical periodicals that could properly be considered by a medical expert under Rule 803(18). (Affidavit of Dr. Sigmund Friedman, p. 2.) *However, none of the other articles were authenticated.* Therefore:

(i) only 25 of the original 41 "medical articles" were authenticated as such;[17]

(ii) of these 25 articles, 6 were published before the trial in this case, another 10 were published before the judgment

was entered (September 30, 1982), *and 9 articles were published later.*

■ The character of the Hill-Bundren-DDAA "newly discovered evidence" is reflected in the initial Brief in Support of Motion to Set Aside Final Judgment and Reopen the Evidence (pp. 5–11). There, the brief selects quotations from four "of the attached medical articles [to] assist the Court in recognizing the need to set aside the judgment and reopen the evidence because of the threat to the public's health." However, of these quotations:

(i) two are from general news stories, not medical articles—one from Time magazine; and one from a general science magazine;[18]

(ii) the third is from an authenticated medical article, but it does not even concern AIDS—and it was printed in February of 1980, some 16 months before trial;

(iii) the fourth is from an authenticated medical article, but it was published after the August 17, 1982 decision—and, consequently, could not even be considered by this Court in connection with the Rule 60(b) motion.[19]

The only other "evidence" supporting the motion consists of affidavits—of Dr. Sigmund Friedman of New York, of Dr. Paul Cameron, a "licensed psychologist in the State of Nebraska," and of two Dallas dentists (Dr. Keith Thornton and Dr. Randy Richardson), and *testimony given in November of 1981* by Dr. Paul Cameron and Dr. Charles Webb, a physician employed by the Texas Department of Health, at the trial in *Gay Student Services v. Texas A & M University,* CA–H–77–325 (S.D.Tex.

**16.** The Fifth Circuit has been asked to take judicial notice of several articles which have not even been submitted to this Court. Compare Brief for Appellant, pp. viii–x with the appendix to the Motion to Set Aside Final Judgment and Reopen the Evidence.

**17.** The articles not authenticated included an internal document from a medical school, articles from The American Journal of Nursing and the Journal of Homosexuality, and *an editorial* from the American Journal of Public Health.

**18.** In other words, this Court was *seriously* being asked to set aside its judgment because of

"newly discovered evidence" in the form of articles in such eminent medical periodicals as Time, Newsweek, and the Saturday Evening Post. *See footnote 9.*

**19.** "There can be no Rule 60(b)(2) relief for evidence which has only come into existence after the trial is over, for the obvious reason that to allow such a procedure could mean the perpetual continuation of all trials." *NLRB v. Jacob E. Decker & Sons,* 569 F.2d 357, 364 (5th Cir.1978).

1982).[20]  These affidavits and this testimony will be discussed later.

### No "New" Evidence Or Due Diligence

Under Rule 60(b)(2), Hill-Bundren-DDAA must establish that there is "newly discovered evidence" which, in the exercise of reasonable diligence, could not have been discovered at the time of trial—or in time to move for a new trial under Rule 59(b) after this Court's decision was rendered on August of 1982 and final judgment was entered on September 30, 1982.  Fed.R. Civ.P. 60(b)(2); *Smith v. Missouri Pacific R. Co.*, 615 F.2d 683 (5th Cir.1980); *Schepp v. Langmade*, 416 F.2d 276 (9th Cir.1969); Wright & Miller, Fed.Prac. § 2859 (West 1973).

They have not done so.  Indeed, *Hill-Bundren-DDAA have not presented a single affidavit from any of the parties or attorneys who participated in the trial of this case and the post-decision proceedings.*  Accordingly, no showing has been made that the attorneys for the class representatives (District Attorney Wade, City Attorney Holt) were not aware of the proposed "AIDS evidence" before June of 1981, and that they simply elected not to present it as a matter of trial strategy.  Nor has there been any showing that these original parties and attorneys could not have presented these matters, if they wished, either before this Court's decision on August 17, 1982—*or by a timely motion for new trial within ten days after the final judgment was entered on September 30, 1982.*[21]

Moreover, Hill-Bundren-DDAA actually concede that their proposed "newly discovered evidence" was "definitely in existence at the trial of this case in June of 1981"— and that *it could have been presented to the Court in late 1981 (some nine months before the decision was rendered).*  In particular:

> ... as discussed in the preceding section (The "Evidence"), 6 of the authenticated medical articles were published before trial, and another 10 were published before this Court's decision;

> ... *by November of 1981*, both Dr. Charles Webb and Dr. Paul Cameron had given their testimony concerning homosexuals, AIDS, etc. at the trial of *Gay Student Services v. Texas A & M*, CA–H–77–325 (S.D.Tex.1982), reversed 737 F.2d 1317 (5th Cir.1984).[22]

> ... Dr. Sigmund Friedman's affidavit specifically states that "while specific disease manifestations of AIDS, such as pneumocystis carinii pneumonia and Kaposi's sarcoma, had begun to appear and were in existence at the time of the trial in this case, the connection of these specific disease symptoms to the underlying disease syndrome now called AIDS *did not become widely known in the medical profession until toward the end of 1981*, approximately coincident with the December 10, 1981 issue of The New England Journal for Medicine and several important articles therein."

Therefore, this Court is being asked to set aside its judgment upon the basis of (i)

---

**20.**  *Gay Student Services v. Texas A & M University*, 737 F.2d 1317 (5th Cir.1984).

**21.**  Indeed, on August 15, 1982—two days before this Court's decision—the Dallas Times Herald's lead article in the Metro section was a story concerning AIDS entitled "Deadly Illness Hits Homosexuals, Puzzles Doctors."  A copy of this article is attached as Appendix B.  Although it is hearsay and will not be considered by this Court as truth of the matters asserted, the article does contain discussions of most of the "newly discovered evidence" which Hill-Bundren-DDAA claim *could not* have been found with due diligence until April of 1983.  This newspaper article, of course, is not essential to this decision— but it does illustrate that, if the original parties

and attorneys had wanted to do so, they could have called these "AIDS matters" to the attention of the Court by a timely motion for new trial under Rule 59(b) *before October 10, 1982.*

**22.**  Indeed, this Court studied the briefs in the *Gay Student Services v. Texas A & M* before the August 17, 1982 decision was rendered in this case.  Hill-Bundren-DDAA state: "As Dr. Webb's quoted testimony demonstrates, even the Chief Epidemiologist of the Texas State Department of Health was not aware of the AIDS evidence from across the country *until approximately the time of [the June 1981] trial in"* Baker v. Wade." [Defendant's Reply to Plaintiff's Brief in Opposition, pp. 7–9].

6 medical articles published before trial, (ii) 10 additional medical articles published before final judgment was entered, and (iii) testimony by Drs. Cameron and Webb that was actually given in November of 1981. And, this request is based upon the bald assertion—*unsupported by any affidavit*—that the parties and the attorneys who tried this case could not discover this "evidence" because it was "difficult" to do so and because "a number of the medical articles ... were just becoming available at or about the time of trial." Nor do Hill-Bundren-DDAA even attempt an explanation of why, in the exercise of reasonable diligence, this "new evidence" could not have been presented to this Court in late 1981 [23]—or even the following year, before the August 17, 1982 decision—or, as Rule 60(b)(2) requires, by a Rule 59(b) motion for new trial before October 10, 1982.

There is no "newly discovered evidence." Nor have Hill-Bundren-DDAA shown any exercise of "due diligence." All they have shown is the fact that they disagree with the trial strategy of the class representatives and their attorneys—and that they wish to retry this case. Obviously, this is not a proper basis for relief under Rule 60(b)(2).

**No Different Result**

Hill-Bundren-DDAA also claim, as they must under Rule 60(b)(2), that their "newly discovered evidence" would require a different result:

> "... there can be no doubt in the instant situation that the proposed AIDS evidence is both eminently material and would probably require a different result from that rendered by the Court without

the benefit of consideration of the AIDS evidence." [24]

This claim is baseless. Even if this Court were to consider all of the "evidence" submitted by Hill-Bundren-DDAA, there would be no different result in this case. There is no "compelling state interest justifying § 21.06 (right of privacy)— and this statute "bears no rational relationship to any legitimate state interest" (equal protection). 553 F.Supp. at 1141–45.

It is obvious that the Texas Legislature did not consider the AIDS problem when it passed § 21.06 as part of the general revision of the Penal Code in 1974. (553 F.Supp. at 1125–26, 1133–34). Indeed, the AIDS epidemic did not even exist at that time; as Hill-Bundren-DDAA concede, it was 1981 before this severe problem was even recognized by the medical profession. And, the only available legislative history indicates that the sole basis for § 21.06 was the fear of "a backlash effect against the entire [revised] Penal Code should [private homosexual] acts be decriminalized." (553 F.Supp. at 1150–51.)

This is confirmed by the 1983 legislative history concerning § 21.06. Representative Bill Ceverha—supported by Hill-Bundren-DDAA—attempted through HB 2138 to revise § 21.06 and drastically increase its penalties. The Texas Legislature (through the House Criminal Jurisprudence Committee) considered—*and rejected*—the same "AIDS evidence" and arguments being presented to this Court. The fact that HB 2138 died in committee at the end of the 1983 session certainly indicates that the State has no "compelling" or "rational" interest in seeking to address the serious problems of AIDS by fining homosexuals

---

**23.** If such a motion had been filed, it would have been considered. Indeed, on August 17, 1981, the plaintiff filed a motion for this Court to reopen the evidence and take judicial notice of certain "legislative history" concerning § 21.06 (553 F.Supp. at 1151) and certain laws of other states concerning sodomy. *The defendants opposed this motion.* It was granted in part by Order entered August 24, 1982, one week after the decision was issued.

**24.** Their argument before the Fifth Circuit is even stronger. There, they assert that "this case does not involve any actual facts or controversy" ... they ask the Fifth Circuit to take "judicial notice" of a number of "medical articles" (comparable to those presented to this Court) and of affidavits and testimony given in other cases ... and to reverse and render judgment that § 21.06 is constitutional. *Surprisingly, they make these requests without directly attacking a single finding of fact made by this Court.* (553 F.Supp. at 1126). Once again, see footnote 9.

$200 for engaging in private, consensual sexual conduct.

It is not necessary for this Court to resolve the differences between the "expert opinions" expressed in the affidavits filed by Hill-Bundren-DDAA [25] and those contained in the affidavits filed by the plaintiff. However, as to the major conflict—whether or not a criminal statute (§ 21.06 or HB 2138) is a valid means of addressing serious health problems such as the AIDS epidemic—the Hill-Bundren-DDAA arguments do present some problems:

> ... if prohibiting private, consensual homosexual conduct will effectively combat AIDS, should the State of Texas also ban private, consensual heterosexual acts by Haitians, hemophiliacs and drug addicts?

> ... if any criminal statute is "justified," shouldn't it be "narrowly drawn" to prohibit those persons who know that they have AIDS (whether homosexuals, Haitians, hemophiliacs, or drug addicts) from either having sexual contacts or donating blood?

> ... if criminal sanctions against private homosexual conduct will control the AIDS epidemic, should the State also try to stop herpes and other venereal diseases by prohibiting sex between men and women? [26]

> ... if AIDS can be wiped out by statutes such as § 21.06, should the State consider passing criminal laws against other diseases? [27]

Fortunately, questions such as these are initially for the Texas Legislature, not this Court. And, just as the Texas Legislature did not find the Hill-Bundren-DDAA "AIDS evidence" convincing in its 1983 session, this Court concludes that the evidence is certainly not sufficient to require a different result in this case.

## No Fraud or Misrepresentation

The next argument by Hill-Bundren-DDAA is distressing. They claim that Dr. William Simon and Dr. Judd Marmor misrepresented facts to this Court and committed fraud with respect to their testimony, supposedly justifying a new trial under Fed.R.Civ.P. 60(b)(3).

At first, this claim was totally unsupported—by affidavit or otherwise. Then, after the plaintiff objected, Hill-Bundren-DDAA "supported" their claim of fraud and misrepresentation by two affidavits, both by Dr. Paul Cameron. Even then, Dr. Cameron did not *directly* accuse Drs. Simon and Marmor with fraud; instead, he

---

25. However, most of the Hill-Bundren-DDAA affidavits do not constitute "newly discovered evidence" under Rule 60(b)(2). Some of the opinions stated could, with due diligence, have been presented to this Court before its decision was rendered (e.g., Drs. Simon and Webb). Some appear to be "current opinions"—i.e., they were formed after final judgment, and are no basis for relief under Rule 60(b)(2) (e.g., Drs. Thornton and Richardson). *NLRB v. Jacob E. Decker & Sons,* 569 F.2d at 364. And, others are simply disagreements with this Court's decision or the testimony which this Court heard and credited at trial (e.g., Drs. Friedman, Simon).

26. Hill-Bundren-DDAA also argue, both before this Court and the Fifth Circuit, that § 21.06 is justified by evidence of other "public health" considerations (hepatitis, syphilis, other venereal diseases). Brief for Appellant, pp. 41–43. However, they have not even attempted to establish that this is "newly discovered evidence" which could not, with due diligence, have been presented before this Court's decision. Indeed, it is contrary to the evidence presented at trial. (553 F.Supp. at 1141–43.)

27. Clarence Darrow found such a system of justice in "Erehwon," a story by Samuel Butler: "... if some one had a disease he was at once sent to a criminal court. Mr. Jones, we will say, is led into court charged with tuberculosis. The judge asks him what he has to say for himself, and he replies that he was born with a weak constitution, that he is poor and has been forced to work in inclement weather and unventilated surroundings, and so developed tuberculosis. Thereupon the judge, with the judge's zeal for justice, turns over the pages of his docket and says, 'Mr. Jones, weren't you in this court a year ago for pneumonia?' The poor fellow replies 'Yes—' he had been working in the rain and cold, and had not known that it would cause pneumonia. The judge promptly replied that ignorance was no excuse for crime. On further examination it was disclosed that he was once in court afflicted with a severe cold; it was therefore clear that he was an habitual criminal, and thereupon he was sent to prison for life." Darrow, The Story of My Life pp. 357–58 (Gossett & Dunlap 1932).

merely expressed opinions contrary to theirs. *To seriously contend that a differ-ence in "expert" opinions constitutes fraud and misrepresentation is ridiculous.*[28]

This Court will not dignify such a baseless assertion with a discussion. It will only emphasize two things: *First,* the opinions expressed at trial by Dr. Simon and Dr. Marmor—which were adopted by this Court—were supported by other evidence which is totally ignored by Hill-Bundren-DDAA, in their charges of fraud and misrepresentation. For example:

(i) Dr. Marmor's testimony that, "although there was 'some disagreement,' almost all American psychiatrists feel that 'homosexuality per se does not constitute any form of mental disorder'" (553 F.Supp. 1129 at n. 15) is supported by resolutions passed by the American Psychiatric Association, the American Psychological Association, the American Medical Association and others (553 F.Supp. at 1130).[29]

(ii) Dr. Simon's testimony that homosexuality is the result of "a relatively long complex process of pshchological and social development" is supported by the Task Force on Homosexuality, among other exhibits (553 F.Supp. at 1129–30).

*Second,* this Court reaffirms its findings that Dr. Simon and Dr. Marmor were very credible witnesses and that their qualifications were impeccable. In contrast, *Dr. Paul Cameron* —the basis of the claim that Drs. Simon and Marmor committed fraud in their testimony—*has himself made misrepresentations to this Court.* For example:

(i) his sworn statement that "homosexuals are approximately 43 times more apt to commit crimes than is the general population" is a total distortion of the Kinsey data upon which he relies—which, as is obvious to anyone who reads the report, concerns data from a non-representative sample of delinquent homosexuals (and Dr. Cameron compares this group to college and non-college heterosexuals);

(ii) his sworn statement that "homosexuals abuse children at a proportionately greater incident than do heterosexuals" is based upon the same distorted data—and, the Court notes, is directly contrary to other evidence presented at trial besides the testimony of Dr. Simon and Dr. Marmour. (553 F.Supp. 1130 at n. 18.)[30]

There has been no fraud or misrepresentations except by Dr. Cameron, the supposed "expert" for District Attorney Hill.[31]

---

**28.** *A reference to footnote 9 is much too kind.*

**29.** *See In re Longstaff,* 716 F.2d 1439, 1450 (5th Cir.1983) ("That homosexuality is no longer considered a psychopathic condition is established by the opinion of the government's highest medical officer, the Surgeon General.")

**30.** Similar testimony by Dr. Cameron was totally discounted by the Fifth Circuit in *Gay Student Services v. Texas A & M University,* 737 F.2d 1317, 1330 (5th Cir.1984); there, the Court rejected the claim that Texas A & M's recognition of a gay student organization "was justifiable as an appropriate means of protecting public health" because:

"... TAMU has simply not proven that recognition will indeed imminently result in such dire consequences. *The speculative evidence offered by the defendants' experts [including Dr. Paul Cameron]* 'for which no historical or empircal basis is disclosed,' cannot justify TAMU's content-based refusal to recognize GSS. *Gay Lib [v. University of Missouri] su-*

*pra,* 558 F.2d [848], at 854 [8 Cir.1977]. We think that on this record TAMU's public health argument is precisely the kind ·of 'undifferentiated fear or apprehension' that the Supreme Court has repeatedly held 'is not enough to overcome the right to freedom of expression.' *Tinker [v. Des Moines Independent Community School Dist.], supra,* 393 U.S. [503] at 508, 89 S.Ct. [733] at 737 [21 L.Ed.2d 731 (1969) ]; *Healy [v. James], supra,* 408 U.S. [169] at 191, 92 S.Ct. [2338] at 2351 [33 L.Ed.2d 266 (1972) ]." (emphasis added.)

**31.** Indeed, the plaintiff contends that Dr. Paul Cameron is not a credible witness because he resigned from the American Psychological Association to avoid an investigation into charges of his unethical conduct as psychologist. The charges of unethical conduct against Dr. Cameron included his continuing misrepresentation of Kinsey data and other research sources on homosexuality; inflammatory and inaccurate public statements about homosexuals; and his fa-

Accordingly, the motion under Rule 60(b)(3) is baseless.

### No "Other Reasons" to Reopen Evidence

Hill-Bundren-DDAA also ask for relief under Fed.R.Civ.P. 60(b)(6), which permits a district court to reopen the evidence for "any other reason justifying relief" from the operation of the final judgment. Here, the only new claim is that:

"... there was very little if any evidence offered concerning the nature and extent of homosexual conduct in the State of Texas. The Court was offered very little evidence concerning what homosexuals do and why homosexual conduct poses such a severe public health threat to the citizens of the State of Texas. The case was tried on the basis of homosexuality as a state of being or lifestyle rather than on the specific acts of 'homosexual conduct.' Common homosexual practices such as 'rimming,' 'scat,' 'handballing,' 'golden showers,' the insertion of various objects into the anus of individuals and oral/anal, oral/penal and penal/anal conduct were not referred to or discussed in depth. The variety of sexual conduct, in conjunction with the frequency of anonymous sexual partners poses substantial considerations which were not presented to the Court in the trial of this matter ..."

This request, too, is baseless. It reveals that Hill-Bundren-DDAA have simply not examined either the trial transcript or the exhibits in this case. This Court did receive and consider evidence concerning homosexual conduct, promiscuity among homosexuals, drug usage among homosexuals, and "common homosexual practices." *See,* e.g., 553 F.Supp. 1131 at n. 13 and 14; 553 F.Supp. at 1134. Although it was not necessary to describe this evidence in detail in the original opinion, two examples should suffice:

brications to a Nebraska newspaper about the supposed sexual mutilation of a four year old boy by a homosexual. See *Psychology, Homosexuality, and Human Rights in Lincoln, Nebraska,* by Dr. James K. Cole; Affidavit of Dr. William Simon.

"... The current sexual rage is a practice in which the fist is inserted directly in the partner's anus. Once thought outrageous, this activity has become a standard vogue, with Crisco used as the preferred lubricant. Now considerably more exotic forms of anal penetration have assumed the vanguard on the kinky fringe of gay sexual practices."

"... There were [in the Eagle Leather/Maple Ranch Wear Boutique] also some nifty bandannas in a wide array of colors. The reason for all the colors? Well, in the hard-core gay bar scene there is a nation-wide code for handkerchiefs that are placed in the back pockets of one's pants. If you're a golden showerer, for example, and want to urinate on someone, then you stick a yellow handkerchief in your left back pocket and hope to run into somebody with a yellow handkerchief in his right back pocket, which means he likes to be urinated on. There are twelve official colors relating to various sexual proclivities. The bandannas are just the C & W version of the system." [32]

Accordingly, the evidence proposed by Hill-Bundren-DDAA would be cumulative and, as the plaintiff correctly contends, totally immaterial. There is no basis for relief under Rule 60(b)(6)—particularly since this rule is intended for "extraordinary cases." *Gray v. Estelle,* 574 F.2d 209, 215 (5th Cir.1978), citing *Ackermann v. United States,* 340 U.S. 193, 200, 71 S.Ct. 209, 212, 95 L.Ed. 207 (1950).

### 3. THE MOTION TO INTERVENE

■ Danny Hill, the District Attorney of Potter County, is a member of the defendant class certified by this Court. (553 F.Supp. at 1125.) By the motion to intervene, he seeks to be substituted as class representative. However, *the motion is not supported by any affidavit.* Hill has

**32.** These quotations are from Defendant Wade's Exhibit No. 1, a Texas Monthly article—"What Do These Rugged Texas He-Men Have In Common?"—*which was admitted into evidence without objection.* 553 F.Supp. 1129 at n. 14, 1149 at n. 4.) See also "Task Force on Homosexuality." (553 F.Supp. 1129 at n. 13.)

made no attempt to show that he would be an adequate representative of the class, as required by Fed.R.Civ.P. 23(a). He has not complied with the local rules of this Court concerning class actions. (Local Rule 10.2, Northern District of Texas.) Instead, Hill merely asserts that he should be permitted to act as class representative since neither of the designated class representatives filed a notice of appeal—and since the State of Texas has dropped its appeal.

Hill has not shown that he is the real party in interest in this case. Indeed, he has not participated in it in any way—and is being represented by a Dallas attorney, Wm. Charles Bundren, who was an incorporator and an attorney for DDAA (see footnote 2). Under these circumstances (see footnote 8), there should be at least a minimal showing that it is Potter County or the Potter County District Attorney—and not DDAA or its attorneys—that is prosecuting these motions (and the attempt to retry this case).

In addition, this Court specifically finds that District Attorney Hill *would not* be an adequate representative for the defendant class which was certified. This finding is based upon the actions of Hill-Bundren-DDAA in connection with the present motions. In particular, Hill-Bundren-DDAA:

(i) filed motions to reopen the evidence and to intervene which were, at first, not properly supported by any affidavits;

(ii) later filed affidavits "supporting" one motion, but have never corrected the defect in the motion to intervene as class representative;

(iii) asked this Court to set aside its judgment based upon "newly discovered" medical evidence which, in part, consists of articles from Time, Newsweek, and the Saturday Evening Post;

(iv) made totally unfounded accusations that two highly qualified and credible witnesses—Dr. Simon and Dr. Marmor—committed fraud and made misrepresentations in their testimony at trial;

(v) relied upon a controversial "expert," Dr. Paul Cameron, who has made misrepresentations to this Court and whose cross-examination in any subsequent hearing could be detrimental to the best interests of the defendant class.

Accordingly, both the "Motion to Set Aside Final Judgment and Reopen the Evidence" and the "Motion to Intervene and Substitute Class Representative" are **DENIED**. However, the Court notes that it would consider permitting the intervention of Danny Hill as an individual defendant upon the filing of a properly supported motion showing that Potter County or the Potter County District Attorney—and not some private group—is the real party in interest.[33]

## APPENDIX A

102 S. Ct. 2421, 2426 n.11 (1982) (emphasis added) citing, Hughes Tool Company v.' Transworld Air Lines, Inc., 409 U.S. 363, 366 n.1 (1973). If the denial of certiorari imports no implication or influence about the merits, how can it plausibly be argued that it represents a "doctrinal development." Nonsense. The overwhelming body of law clearly holds that a certiorari denied ruling by the Supreme Court expresses no

**33.** The plaintiff is the "prevailing party" on the post-trial motions disposed of by this supplemental opinion, and is entitled to recover reasonable attorneys fees under 42 U.S.C. § 1988. These will be taxed against Danny Hill, District Attorney of Potter County, Texas, the named party on whose behalf the motions were filed. However, this Court's decision as to the amount of attorneys fees to be awarded will be reserved until the appeal in this case is concluded.

opinion on the merits of the case. In fact, the cases are legion in holding that the Supreme Court expresses no opinion on the merits of a case when it denies a petition for writ of certiorari. See generally 12 MOORE'S FEDERAL PRACTICE ¶ 400.05-2 [4] and cases cited therein. Thus, Onofre does not represent a doctrinal development; it merely represents an expression of "no view." Because Commonwealth's Attorney was summarily affirmed, its legal precedent far outweighs the Court's "no view" expression in Onofre

    b.   Carey v. Population Services, 431 U.S. 678 (1977)

The trial court's analysis of Carey is just as troubling. Carey, in the broadest sense of its terms, does not represent a "doctrinal development" to engage in private consensual homosexual conduct. In Carey, the Supreme Court held that a state may not regulate the distribution of contraceptives to minors. Carey did not concern the issue of whether there is a right of privacy to engage in consensual homosexual conduct. In fact, as the trial court noted, that proposition was

APPENDIX B

Dallas Times Herald

Action Line 2

Weather 2

Metro

Sunday, August 15, 1982 · · ·

# Deadly illness hits homosexuals, puzzles doctors

By LINDA LITTLE

Staff Writer

A mysterious illness believed to be transmitted primarily through homosexual contact is hitting young men in epidemic proportions, making killers of infections and a rare cancer that usually are not fatal.

Researchers believe the condition weakens the body's defense against disease and makes victims susceptible to illnesses their bodies normally could overcome. The illness—diagnosed in 10 to 15 patients each week—already has become more deadly than toxic shock syndrome and Legionnaires' disease combined.

To date, the U.S. Centers for Disease Control in Atlanta said 519 cases have been reported in the United States, mostly among homosexual men. But the condition also is showing up in others with increasing frequency. About half the patients have died of a rare cancer called Kaposi's sarcoma, of an equally rare form of pneumonia or of viral infections that normally are not fatal.

Most of the victims—about 75 percent—are homosexual or bisexual males. A few are drug addicts. A small percentage fits neither category. Most of the cases have occurred in New York and California; Texas ranks fifth in the United States with 12 reported cases.

In Dallas, a 47-year-old man with the condition died after intensive chemotherapy failed to cure his Kaposi's sarcoma. Another area man with the illness is afflicted with lowered defenses against infection but has yet to suffer serious side effects.

"There is serious fear and panic, because the indications are that it is spread through sexual contact," said Bill Nelson, a spokesman for the Dallas Gay Alliance. "There is serious concern about it."

*'There already have been more deaths than with toxic shock syndrome and Legionnaires' disease combined, and it may only be the tip of the iceberg.'*

—Dr. Harry Haverkos of the U.S. Public Health Service

Federal public health officials are calling the condition the most pressing and serious public health concern this year. They are meeting with leaders of the National Gay Alliance in Dallas this weekend to discuss the problem and ways of combating it.

"There already have been more deaths than with toxic shock syndrome and Legionnaires' disease combined," said Dr. Harry Haverkos of the U.S. Public Health Service. "And it may only be the tip of the iceberg of the outbreak."

Officials at the CDC have given the epidemic top priority. More than 100 researchers are attempting to find the cause, mode of transmission and a treatment for the mystifying condition, called acquired immune deficiency—AID for short.

It is an unprecedented phenomenon. Not only does it present the first epidemic of what appears to be a deficiency of the body's immune system to fight infection, but researchers say it may be unleashing the first epidemic of cancer in this country.

Although the spread of AID has not reached the proportions of the major flu epidemic, federal health officials are calling the number of cases an epidemic because of the sudden occurrence and the mystery concerning its cause and cure.

"This is a hell of a lot of people, especially when you consider that many will eventually die," said Dr. Frederick Siegal of Mount Sinai Medical Center in New York. "They may not die of the first, second or third infection, but eventually one will come along and cause their death.

"It is a horrendous, terrible business. We stand there and treat the infections and try to figure out what to do next, but no one has come up with a medical treatment for the underlying deficiency."

Earlier this year, Siegal successfully treated a young man for a rare type of pneumonia. Now the patient is going blind from an eye infection.

Medical investigators have traced the condition back to 1978, but the illness first aroused doctors' suspicions in May 1980.

A 24-year-old man was referred to Siegal for treatment of a viral infection. Despite intensive, normally effective treatment, the man "continued to waste away, literally withering away, dying of a heart attack," the doctor said.

Eight months later, two more young men were referred to Siegal at Mount Sinai with similar devastating infections. All three men were homosexual.

"It was then we realized something special was going on," Siegal said.

About the same time, doctors in California were puzzling over an unusually severe yeast infection in a young man, who then developed a rare form of pneumonia caused by the parasite Pneumocystis carinii.

Dr. Michael Gottlieb of the University of California School of Medicine in Los Angeles said only one case of this type of pneumonia had been reported previously in a normally healthy individual. The California doctors found a marked deficiency in the man's ability to fight infection, a medical rarity itself that usually only occurred in infants with genetic defects.

See NEW on Page 8

DALLAS TIMES HERALD

8—B    Sunday, August 15, 1982

# New Illness mainly hits homosexuals

NEW—From Page One

"He recovered from the pneumonia," Gottlieb said. "Then he experienced a wasting syndrome where he just failed to thrive and became emaciated."

The man, who also was homosexual, survived a second bout of pneumonia but developed the reddish-violet skin lesions typical of Kaposi's sarcoma. He died of the cancer within a year of his first visit to the doctors.

The cases continue to occur with increasing frequency. To date, of the 505 victims of AID, 212 have died. More than half have had pneumonia, a third had cancer and 51 had other serious illnesses.

Of the minority of cases occurring among women and in heterosexual men, a common characteristic is intravenous drug abuse. The illness also has occurred among a small number of Haitian immigrants, among whom neither homosexuality nor drug use was evident.

Findings from several studies support the theory that AID is transmitted sexually. A study conducted by the Los Angeles Health Department identified 19 homosexual men with Kaposi's sarcoma who also had lowered body immunity. Of the 13 interviewed, nine had had sexual contact with each other.

"This doesn't prove it, but it definitely suggests this may be sexually transmissible," Gottlieb said. "It exceeds what you would expect by chance alone.

"I am still seeing patients as a part of that cluster," he said. "Patients are still coming to me with AID who had contact with patients in that study."

In addition, a survey taken by federal health officials showed that homosexual men with AID had been more promiscuous and had contracted sexually transmitted disease more frequently than others studied.

More recently, the disease control centers have discovered AID in three people with hemophilia, suggesting that the condition might be transmitted through blood transfusions.

"It appears it can be spread through blood products," Siegal said. "And we have no way of telling which (blood products) are safe and which are not. In that respect, even if you stick to the straight and narrow—never taking drugs and having a monogamous heterosexual relationship—you still have some risk of contracting the disease.

Most of the patients have nonspecific symptoms at first. There is a swelling of the lymph glands, weight loss, fever and diarrhea.

The most alarming thing about AID is that it appears to destroy the body's defense against disease.

The body's immune system acts as the army providing first-line defense against bacteria, viruses and conceivably some cancer.

"It seems to score a direct hit on the immune system, paralyzing it," Gottlieb said. "Patients go on to get serious infections, infections they normally wouldn't get if their immune systems were intact."

Gottlieb said the breakdown appears to be in the white blood cells, called the T lymphocytes, which attack viruses, fungi, parasitic infections and cancer.

"They (T lymphocytes) seem to sustain the bulk of the damage," he said.

Other researchers hypothesize that other parts of the body's defense system might be affected as well.

The breakdown in the natural defense system makes the patients more susceptible to viral infections and cancer, they say. Although researchers have been able to treat the illnesses that occur when the body's defense system is weakened, they are not able to correct the underlying immune deficiency.

"If you can't make the immune system work properly, then nothing else you do will be beneficial," Siegal said. "People can't survive in an environment that contains all these microorganisms."

A popular theory about the cause of AID is that a virus, maybe one as yet unknown, attacks the body's defense system, said Dr. James Curran of the CDC task force studying acquired immune deficiency.

Although several known viruses are suspect, Curran said, it is likely that the agent causing the deficiency is either a new, yet undescribed virus or a more virulent strain of a known virus.

"It's most likely something we have never heard of before," Siegal said.

Once the immune system is suppressed, the AID patients develop a variety of illnesses, from rare forms of cancer and pneumonia to viruses that normally are not nearly as devastating.

In addition, many clinics across the country are reporting an increasing number of homosexual men showing up with enlargement of lymph nodes throughout their bodies. Their immunity to disease appears low, and doctors fear the symptoms could represent the early stages of AID.

Officials attending the National Gay Leadership Conference in Dallas this weekend are hoping to make specific recommendations to help homosexuals reduce their chances of getting the condition.

Stanley Matek, president of the American Public Health Association, encouraged homosexuals to mobilize their "political muscle" to ensure financing for federal research about AID.

"Right now they are robbing Peter to pay Paul," he said. "Peter isn't rich enough in the first place. It's only a temporary device."

Matek said the CDC expects to spend $2 million on acquired immune deficiency research in 1982 and an additional $1.2 million next year, but no spending is planned for 1984.